27 A.3d 964

STEVEN JECKER AND LAURA JECKER, PLAINTIFFS–APPEL-LANTS, v. HIDDEN VALLEY, INC., DONALD BEGRAFT, DAVID BARON AND DANIEL GRUND, DEFENDANTS–RE-SPONDENTS.

Superior Court of New Jersey
Appellate Division

Submitted April 5, 2011—Decided July 26, 2011.

entanglement in church matters, and that it can be determined by use of neutral principles. *See Menorah Chapels, supra,* 386 *N.J.Super.* at 109, 899 *A.2d* 316. However, we do not foreclose further consideration of this issue, should it be warranted.

156

Before Judges CARCHMAN, GRAVES and MESSANO.

*Carl A. Salisbury (Kilpatrick, Townsend, Stockton, LLP )*, attorneys for appellants.

*Ianetti & Ianetti, LLP*, attorneys for respondents Hidden Valley, Inc. and Donald Begraft (*Patrice Renner Ianetti,* on the brief).

Respondent David Baron has not filed a brief.

Respondent Daniel Grund has not filed a brief.

The opinion of the court was delivered by

MESSANO, J.A.D.

Following a bench trial, the judge concluded that plaintiffs Steven and Laura Jecker had "failed to prove a cause of action" against defendants Hidden Valley, Inc. (Hidden Valley), Donald Begraft, Daniel Grund and David Baron (collectively, defendants). Plaintiffs now appeal. We have considered the arguments raised in light of the record and applicable legal standards. We affirm for reasons other than those expressed by the trial judge. *See El–Sioufi v. St. Peter's Univ. Hosp.,* 382 *N.J.Super.* 145, 169, 887 *A.*2d 1170 (App.Div.2005) (noting "that a correct result, even if predicated on an erroneous basis in fact or in law, will not be overturned on appeal").

The litigation had its genesis when plaintiffs filed lawsuits against Hidden Valley and Begraft in 1998.[1] Both plaintiffs had

---

[1] The complaints are not part of the appellate record. It appears that plaintiffs were not married when the complaints were filed and the complaints were consolidated for the purposes of trial. To avoid confusion, we shall refer to

been employed by Hidden Valley, a ski resort in Vernon, and alleged that the corporation and Begraft, its sole shareholder and president, breached an employment agreement with Steven, failed to pay Laura sales commissions, and failed to repay loans made to Hidden Valley. The case was tried to a jury and verdicts against Hidden Valley were returned on January 28, 2003.[2] Defendants moved for a new trial, and, on December 12, 2003, the judge granted the motion and vacated the verdicts. The parties then agreed to arbitrate their dispute.[3]

On December 3, 2007, plaintiffs filed this suit alleging that while the underlying dispute was pending, Begraft caused the assets of Hidden Valley to be transferred to Grund, Baron and "certain persons or corporate parties who are partnered with, affiliated with, or controlled by Grund and/or Baron" in violation of "New Jersey's Uniform Fraudulent Transfers Act [ (UFTA) ]."[4] Plaintiffs' complaint sought 1) to set aside the transfers of Hidden Valley's assets; 2) the appointment of a receiver; 3) an accounting; and 4) imposition of a constructive trust.

The case was tried on January 13, 2010. Plaintiffs introduced various documents into evidence and the parties stipulated that plaintiffs' lawsuits were pending when "the sale [of Hidden Valley's assets] took place," and that "there [we]re now no longer sufficient assets belonging to Hidden Valley to satisfy a verdict of

---

plaintiffs by their first names when necessary. We intend no disrespect by this informality.

[2] Steven's case resulted in a verdict in his favor for $139,630.73, and a verdict in favor of Hidden Valley for $2922. The jury returned a verdict in favor of Laura for $11,375.

[3] At the time of the trial in this case, the arbitration was still pending.

[4] The UFTA, *N.J.S.A.* 25:2–20 to –34, specifically repealed the prior Uniform Fraudulent Conveyance Act (UCFA), *N.J.S.A.* 25:2–7 to –19. *See Barsotti v. Merced*, 346 *N.J.Super.* 504, 514, 788 *A.*2d 802 (App.Div.2002). Plaintiffs' references to the UFTA also included *N.J.S.A.* 25:2–1 to –6, which pre-existed adoption of the UFTA.

$148,000 if that verdict [were] reinstated." Plaintiffs rested without calling any witnesses.

Defendants called Steven as their first witness. The documentary evidence introduced by plaintiffs, or during Steven's testimony, revealed that Hidden Valley entered into a reorganization plan under Chapter 11 of the Bankruptcy Code in 1992. At the time, Begraft was an "80% shareholder" of Hidden Valley, held two mortgages on the property, as well as a "[s]ecured [c]laim, not to exceed $300,000, for financing the [p]ost-petition operations" of Hidden Valley. The reorganization plan provided that Begraft would continue to maintain his security interests, but that no payments toward principal or interest on the mortgages would be made for two years.

In March 1999, Begraft filed a complaint against Hidden Valley seeking to foreclose on the two mortgages. On April 3, 2007, final judgment was entered in favor of Begraft, the judge finding Begraft was entitled to $6,128,069.80 out of the sale of the mortgaged premises. In July 2007, Begraft entered into a purchase and sale agreement with Hidden Valley Resort Partners, L.L.C. (Resort Partners), of which Grund was a managing member. Pursuant to the terms of the agreement, Begraft assigned his "bidding rights" at the anticipated sheriff's sale to Resort Partners for $2.3 million dollars, $300,000 to be paid at closing, with the balance payable over five years. Begraft agreed to indemnify and hold Resort Partners harmless from plaintiffs' claims. At the same time, Hidden Valley entered into a purchase and sale agreement in which it agreed to convey its good will and personal property to Resort Partners for $100,000.

Begraft was the sole and successful bidder at the sheriff's sale held in August 2007, at which he bid $100.[5] On October 16, 2007, Hidden Valley, Begraft, and his related entities assigned "all of

---

[5] It is undisputed that plaintiffs were aware of the pending sheriff's sale. During colloquy with the judge, defense counsel read portions of a letter from plaintiff's counsel acknowledging the pending sale.

the rights and interests necessary to operate and manage what is known as the 'Hidden Valley Resort[']" to Resort Partners and its related entities.[6] These transactions in 2007 formed the basis of plaintiffs' UFTA claim.

Steven testified that he was employed by Hidden Valley as its general manager beginning in 1993. Although not specifically engaged to sell Hidden Valley, Steven acknowledged that he and Begraft "always discussed" that possibility. Steven identified a letter he sent to Begraft in December 1997 in which he admitted his goal in taking the position "was to sell the company," and that Hidden Valley "might or might not show profitability in the long run." Steven admitted that he knew Begraft "wanted to sell Hidden Valley and recoup his investments and get out of the ski business." Steven acknowledged that he would earn a commission if the resort were sold, and, that he was interested in buying Hidden Valley himself. Steven was aware that Hidden Valley "had lots of debts," "couldn't pay its bills[,]" and, on occasion, could not pay him.

When Steven was asked the factual basis for his claim that Begraft had committed fraud, he explained:

Because Mr. Begraft was the sole stockholder, the sole owner foreclosed to himself in order to sell, in order to make sure there were not outstanding liabilities or debts on the assets. The shell of the company would remain with whatever liabilities, but there would be nothing left to transfer. If Mr. Begraft truly wanted to sell out ... he could have just sold the company the way it was. He didn't have to foreclose....

. . . .

I personally don't see any reason, any need to foreclose, I mean you're both the bank and the company.... There are no other stockholders to acknowledge, there is no other person who is hurt by that. And then to foreclose, take the assets to yourself and then sell those assets and then take paper back on it, you're almost back to the same position. Except that there are no liabilities and nothing for us to hopefully some day go after.

---

[6] Baron and Grund executed this "Omnibus Assignment & Assumption Agreement" as managing members of Resort Partners. Although two other people also executed the document as managing members, they were not named as defendants.

Begraft was the only other witness to testify. Loans he made to Hidden Valley were secured by two mortgages that were "recognized as legitimate" by the bankruptcy court. Hidden Valley was never profitable and could not pay the principal or interest on the mortgages. Begraft concluded that "[he] just had to sell it." On cross-examination, Begraft acknowledged that he did not retain counsel for Hidden Valley so it could "defend the foreclosure action that [he] filed against" the corporation. Defendant rested after Begraft's testimony.

After considering the summations of counsel, the judge entered his oral opinion on the record. He noted that the bankruptcy reorganization plan recognized Begraft's claims were "fully secured," and that he "would retain a security interest and liens to the property." The judge further found that Begraft "had been trying to actively get himself out of the ski business ... [and] was trying to sell th[e] property for an extended period of time[,] ... includ[ing] the time when ... Steven ... was working as the manager of the ... property." Citing extensively from Steven's 1997 letter to Begraft, the judge concluded "this letter reveals that [Steven] knew that ... Hidden Valley[ ] was, in financial terms, in the red for quite some period of time. That there was no likelihood that a gain would be realized from it, absent some extraordinary event, such as a sale to another party." Turning to the 2007 transactions, the judge observed that the purchase and sale agreement between Begraft and Resort Partners recognized plaintiffs' claims were "still in existence." He also determined that plaintiffs knew of the foreclosure action and did not "attempt to intervene ... or seek some other relief through the Court."

Noting that the burden was on plaintiffs to prove a violation of the UFTA by clear and convincing evidence, the judge considered plaintiffs' proofs regarding the so-called " 'badges of fraud' " identified by the Supreme Court in *Gilchinsky v. Nat'l Westminster Bank N.J.*, 159 *N.J.* 463, 476, 732 *A.*2d 482 (1999). The judge determined "under the totality of circumstances ... that ... Begraft was a credible witness and did not appear to be engaging

in fraud. He was merely a business man who was attempting to extricate himself." The judge further concluded, "I am satisfied that based upon all the evidence that has been presented here that an insufficient showing has been made by the [p]laintiff[s] of a fraudulent intent." He entered the order dismissing plaintiffs' complaint, and this appeal followed.

"Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review: 'we do not disturb the factual findings and legal conclusions of the trial judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]'" *Seidman v. Clifton Sav. Bank, S.L.A.*, 205 *N.J.* 150, 169, 14 *A.*3d 36 (2011) (alteration in original) (quoting *In re Trust Created By Agreement Dated December 20, 1961, ex. rel. Johnson*, 194 *N.J.* 276, 284, 944 *A.*2d 588 (2008)) (internal quotation omitted); *Rova Farms Resort, Inc. v. Investors Ins. Co.*, 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974) (quotations omitted) (the judge's factual findings "should not be disturbed unless they are so wholly insupportable as to result in a denial of justice"). However, "[a] trial court's interpretation of the law and the legal consequences that flow from established facts are not entitled to any special deference." *Manalapan Realty, L.P. v. Twp. Comm.*, 140 *N.J.* 366, 378, 658 *A.*2d 1230 (1995).

Plaintiffs contend that the judge's conclusion—they failed to meet their burden of proof as to defendants' fraudulent intent— was contrary to the evidence. In particular, they argue that the judge misapplied the *Gilchinsky* "badges of fraud," focusing on some that were not present, ignoring several that were, and applying others that were present but of marginal relevance or importance.

As the Court explained in *Gilchinsky:*

In determining whether a transfer constitutes a fraudulent conveyance, there are two relevant inquiries. The first is whether the debtor [or person making the conveyance] has put some asset beyond the reach of creditors which would have

been available to them at some point in time but for the conveyance. The second is whether the debtor transferred property with an intent to defraud, delay, or hinder the creditor. Transfers calculated to hinder, delay, or defeat collection of a known debt are deemed fraudulent because of the debtor's intent to withdraw the assets from the reach of process. Both inquiries involve fact-specific determinations that must be resolved on a case-by-case basis. The person seeking to set aside the conveyance bears the burden of proving actual intent.

In determining whether the circumstances of a particular transaction give rise to the conclusion that the transferor intended to thwart or evade creditors, courts generally look to factors commonly referred to as badges of fraud. Badges of fraud represent circumstances that so frequently accompany fraudulent transfers that their presence gives rise to an inference of intent.

[*Gilchinsky, supra,* 159 *N.J.* at 475–76, 732 *A.*2d 482 (alteration in original) (citations and quotations omitted).]

Plaintiff bears the burden of proving the transfer was fraudulent by clear and convincing evidence. *Barsotti, supra,* 346 *N.J.Super.* at 520, 788 *A.*2d 802.

Factors to be considered in determining fraudulent intent, i.e., "badges of fraud," include whether:

a.   The transfer or obligation was to an insider;

b.   The debtor retained possession or control of the property transferred after the transfer;

c.   The transfer or obligation was disclosed or concealed;

d.   Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;

e.   The transfer was of substantially all the debtor's assets;

f.   The debtor absconded;

g.   The debtor removed or concealed assets;

h.   The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

i.   The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j.   The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k.   The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[*N.J.S.A.* 25:2–26.]

The *Gilchinsky* Court instructed:

In determining actual intent to defraud, courts should balance the factors enumerated in *N.J.S.A.* 25:2–26, as well as any other factors relevant to the transaction. . . . *The proper inquiry is whether the badges of fraud are present, not*

*whether some factors are absent.* Although the presence of a single factor, *i.e.* badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud.

[*Gilchinsky, supra,* 159 *N.J.* at 477, 732 *A.*2d 482 (first emphasis added).]

Plaintiffs contend that several "badges of fraud" were evident in the 2007 transactions. Contrary to the judge's finding, Begraft retained possession of the property after the foreclosure and until he sold Hidden Valley's assets to Resort Partners. *See N.J.S.A.* 25:2–26(b). Additionally, contrary to the judge's conclusion, all of Hidden Valley's assets were transferred, first to Begraft and later to Resort Partners, *N.J.S.A.* 25:2–26(e), resulting in Hidden Valley becoming insolvent. *See N.J.S.A.* 25:2–26(i). The judge did find that the foreclosure was initiated after Hidden Valley and Begraft "had been sued or threatened with suit." *N.J.S.A.* 25:2–26(d). Plaintiffs also argue that *N.J.S.A.* 25:2–26(a) applies because the transfer was to an insider. *See N.J.S.A.* 25:2–22(b) (defining "[i]nsider" when the debtor is a corporation).

Plaintiffs acknowledge the judge's findings that there was no evidence the debtor absconded, or removed or concealed assets, or the value of the consideration paid for the assets was indicative of a fraudulent transaction. *See N.J.S.A.* 25:2–26(f), (g), and (h). However, they contend that the judge placed undue emphasis on factor (g), particularly focusing on plaintiffs foreknowledge of the foreclosure and sheriff's sale, and their failure to intervene in the foreclosure. *See Gilchinsky, supra,* 159 *N.J.* at 481, 732 *A.*2d 482 ("The openness and veracity of the transaction is irrelevant where other factors establish the debtor's intent to impede exaction.").[7]

■ Essential to plaintiffs' arguments is the conflation of both events, i.e., the foreclosure and Begraft's subsequent transfer of Hidden Valley's assets to Resort Partners. As the above-high-lighted portion of Steven's testimony demonstrates, plaintiffs es-

---

[7] In their reply brief, plaintiffs also argue that the transfer was not for "reasonably equivalent value" because Begraft only bid $100 at the sheriff's sale and received all of Hidden Valley's assets.

sentially alleged Begraft's mortgages were a "sham." However, there is no proof to support that assertion. The mortgages preexisted plaintiffs' lawsuit, were recognized by the bankruptcy court as legitimate, and, together with the post-petition operating expenses, remained secured debt as part of Hidden Valley's reorganization plan.

More importantly, the foreclosure action, standing alone, cannot be a fraudulent transfer under the express terms of the UFTA. The statute defines under what circumstances a "transfer" is deemed fraudulent. *N.J.S.A.* 25:2–25. " 'Transfer,' " in turn, is defined as "every mode, direct or indirect ... of disposing of or parting with an asset." *N.J.S.A.* 25:2–22. *N.J.S.A.* 25:2–21 provides: " 'Asset' means property of a debtor, but the term does not include ... [p]roperty to the extent it is encumbered by a valid lien." " 'Valid lien' means a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings." *N.J.S.A.* 25:2–22. "Hence a transfer of fully encumbered property does not involve an asset of the debtor and ... it is not a 'transfer' at all within the meaning of the [UFTA]. Thus state courts have consistently held that a transfer of fully encumbered property may not be set aside under the [UFTA]." David B. Young, *Preferences and Fraudulent Transfers, in* Understanding the Basics of Bankruptcy & Reorganization 2007, at 713, 733–34 (PLI Commercial Law and Practice Course Handbook Series No. 11219, 2007).

In *Karo Mktg. Corp., Inc. v. Playdrome Am.,* 331 *N.J.Super.* 430, 444, 752 *A.*2d 341 (App.Div.), *certif. denied,* 165 *N.J.* 603, 762 *A.*2d 217 (2000), we held that where a purported asset has no monetary worth, a claimant has "failed to demonstrate a cause of action under the [UFTA] ... because technically no asset of value was transferred." No reported case in New Jersey has squarely addressed whether a foreclosure sale is a "transfer" under the terms of the UFTA. Courts elsewhere, however, have interpreted other states' versions of the UFTA and reached the conclusion

that conveyances of mortgaged or otherwise fully encumbered assets are not "transfers" under the express terms of the UFTA.

For example, in *In re Wintz Companies*, 230 *B.R.* 848, 861 (8th Cir.BAP 1999), a case cited by *Gilchinsky supra*, 159 *N.J.* at 475, 732 *A.*2d 482, the court reversed a grant of summary judgment that had voided multiple land conveyances in bankruptcy under Minnesota's version of the UFTA. The court noted, "A threshold determination to be made . . . is whether 'transfers' occurred at all. This inquiry is, in turn, dependent upon another, that is, whether any of the items purportedly 'transferred' constitute 'assets.' " *Id.* at 860. Noting the properties were "encumbered by IRS tax liens and various mortgages," *ibid.*, the court concluded that the UFTA "may only be triggered by its own terms and definitions." *Id.* at 861.

Similarly, in *Yokogawa Corp. of Am. v. Skye Int'l Holdings, Inc.*, 159 *S.W.*3d 266, 269 (Tex.App.2005), the court held that "foreclosure and subsequent transfer of assets . . . are not covered by" Texas' version of the UFTA (TUFTA). "A secured party is entitled to foreclose on its security interest in the event of default." *Ibid.*

[The lenders'] enforcement of its security interest upon . . . default does not constitute a voidable transfer. Nor is the subsequent transfer of the assets from the foreclosure sale actionable under TUFTA. Under TUFTA, "transfer" means disposing of or parting with an asset. Property encumbered by a valid lean [sic] is not an asset under TUFTA. Because the property [the lenders] purchased at the foreclosure sale was encumbered by a valid lien, TUFTA is inapplicable.

[*Ibid.* (citations omitted).]

*See also Mullins v. TestAmerica, Inc.*, 564 *F.*3d 386, 417 (5th Cir.2009) (interpreting TUFTA and holding that "when . . . the disputed property is encumbered by a 'valid lien,' it is not an 'asset' subject to avoidance"); *In re Valente*, 360 *F.*3d 256, 260 (1st Cir.2004) (interpreting Rhode Island's version of the UFTA and holding that "[s]ince the . . . property was only worth $150,000 [and] was encumbered by a $168,000 first mortgage . . . it did not qualify as an 'asset' under the UFTA at the time of the transfer"); *Dietter v. Dietter*, 54 *Conn.App.* 481, 737 *A.*2d 926, 934 ("the assets

... which were encumbered by a valid lien, were not 'assets' within the meaning of the Fraudulent Transfer Act, and, therefore, th[e] transfer [was] not subject to the Fraudulent Transfer Act"), *appeal denied,* 252 *Conn.* 906, 743 *A.*2d 617 (1999); *Farstveet v. Rudolph ex rel. Eileen Rudolph Est.,* 630 *N.W.*2d 24, 34 (N.D.2001) ("Property which is encumbered by valid liens exceeding the value of the property is not an asset within the meaning of the [UFTA] and is not subject to a fraudulent transfer."); *Kellstrom Bros. Painting v. Carriage Works, Inc.,* 117 *Or.App.* 276, 844 *P.*2d 221, 222 (1992) (holding that since the bank held valid security interest in debtor's property, there was no "transfer" and subsequent conveyance to purchaser at auction was not subject to avoidance), *review denied,* 317 *Or.* 162, 856 *P.*2d 317 (1993).

As the above case law amply demonstrates, the transfer of Hidden Valley's assets to Begraft pursuant to the mortgage foreclosure was not subject to the UFTA in the first instance. As the holder of valid liens recognized in the prior bankruptcy proceeding, Begraft was entitled to foreclose on his security interest. The value of Begraft's secured interest as a lender exceeded the value of the property, thus the property was not an "asset" by definition.

■ Plaintiffs failed to establish how Begraft's subsequent transfer to Resort Partners was fraudulent under the UFTA. In this regard, we first note that plaintiffs' prior suit resulted only in a verdict against Hidden Valley, not Begraft. Indeed, it appears that Laura did not name Begraft as a defendant at all. Second, and more importantly, Begraft's sale to Resort Partners bore none of the "badges of fraud" set forth in *N.J.S.A.* 25:2–26. It was not a sale to an insider, Begraft did not retain control of the property, the transfer was disclosed, there was no proof that Begraft conveyed all his assets or otherwise became insolvent, absconded, removed or concealed assets, or that Begraft did not receive reasonable value, $2.3 million, for the assets. In short, plaintiffs failed to demonstrate a violation of the UFTA.

Affirmed.