**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2963-18T4

POLINA ROITBURG, Executor
of the Estate of DAVID
ROITBURG,

      Plaintiff-Respondent/
      Cross-Appellant,

v.

LEONID ROITBURG a/k/a
LEON ROITBURG, DESIGN OF
TOMORROW, INC. a/k/a
EDUCATIONAL and LABORATORY
SYSTEMS a/k/a ELS, NATIONAL
PRECISION TOOL COMPANY, INC.,
a/k/a NPTC,

      Defendants-Appellants/
      Cross-Respondents,

and

LEON ROITBURG, DESIGN OF
TOMORROW, INC. and NATIONAL
PRECISION TOOL COMPANY, INC.,

      Third-Party Plaintiffs-Appellants/
      Cross-Respondents,

v.

POLINA ROITBURG and
IGOR ROITBURG, personally,

      Third-Party Defendants-
      Respondents/Cross-Appellants.
_____

Submitted September 14, 2020 – Decided December 14, 2020

Before Judges Messano and Suter.

On appeal from the Superior Court of New Jersey, Law Division, Morris County, Docket No. L-1478-16.

Dubeck & Miller, attorneys for appellant (Mark D. Miller, of counsel and on the briefs).

Harris Bloom & Archer, LLP, attorneys for respondent (Linda S. Agnew, of counsel and on the briefs).

PER CURIAM

Defendant Leonid (Leon) Roitburg and his brother David were equal shareholders in Design of Tomorrow, Inc. (DOT), a company that constructed custom kitchens and cabinetry and operated out of a building owned by National Precision Tool Company, Inc. (NPTC). NPTC was a corporation in which Leon

2

A-2963-18T4

was the sole shareholder.[1]  Plaintiff Polina Roitburg, David's wife, was DOT's bookkeeper.

Leon and David executed a buy-sell agreement in 2006, which, by its terms was intended "to make provision for the future disposition of the shares of the corporation" and "provide . . . continuity . . . by providing for the purchase of a deceased shareholder's shares[.]"  DOT named each brother as beneficiary of a  $1 million life insurance policy, which, in the event of one brother's death, would be used by the survivor to purchase the decedent's DOT stock from his estate.  The agreement also provided for the repayment of any loans made to DOT by the deceased shareholder: "If the corporation owes money to the deceased shareholder, the corporation shall pay such amount to the estate of the deceased shareholder in the normal course of business, but no later than two [] years following the deceased shareholder's date of death."

According to DOT's accountant, Joseph Brescia, David ran the company without Leon's involvement.  DOT had its "ups and downs" and was insolvent for several years prior to 2013.  During this time, DOT ceased paying its below-market rent to NPTC.  In May 2013, David was diagnosed with brain cancer and

---

[1]  To avoid confusion, we use the first names of members of the Roitburg family. We intend no disrespect by this informality.

A-2963-18T4

ultimately succumbed to the disease in October 2014. However, prior to his death, David secured a $2.05 million contract for DOT to restore and modernize barracks at the United States Military Academy at West Point (the West Point contract).

During the company's lean times, David loaned DOT funds and secured other loans from family and friends. Leon's wife and NPTC also loaned funds to DOT.[2] To successfully obtain the West Point contract, DOT had to execute a subordination agreement, whereby repayment of DOT's loan obligations was subordinated to the surety company.

Leon obtained the $1 million insurance proceeds shortly after David's death, and, in December 2014, paid David's estate and acquired his brother's DOT stock. At the time, there was uncertainty as to exactly how much money DOT owed to David's estate as repayment of his loans to the company. At the subsequent trial, the parties hotly disputed whether promissory notes, allegedly executed to satisfy the surety company of the amount of DOT's loan obligations, reflected the actual amount of loans David made to DOT, and whether the amounts reflected on the company's books as shareholder loans were accurate.

---

[2]  Leon's wife's first name was also Polina. To avoid confusion, we refer to her as Leon's wife throughout the opinion and intend no disrespect.

A-2963-18T4

Although DOT had begun paying David's loans in the ordinary course of business prior to and immediately following his death, the payments ceased in February 2015. Leon instructed plaintiff to make monthly interest payments from DOT to his wife for repayment of monies she loaned to the company during its financial hardships, and to repay loans made by her and NPTC, without paying the balance of David's loan account.

Intrafamily tensions arose, as plaintiff and her son, Igor Roitburg, insisted that the loans David made to DOT be repaid. At one point, Igor used plaintiff's access to DOT's financial information to prepare a spreadsheet of the disputed loan amounts. Unable to resolve the dispute with Leon, plaintiff commenced litigation by filing a complaint against Leon, DOT, and NPTC.

Among the various causes of action in the complaint, plaintiff alleged that DOT breached the buy-sell agreement and owed David's estate more than $600,000 as repayment of loans David made to the company. She also alleged that Leon was the alter ego of DOT and NPTC and had fraudulently transferred funds from DOT to NPTC, in violation of the Uniform Fraudulent Transfer Act (UFTA), N.J.S.A. 25:2-20 to -34. Plaintiff claimed the circumstances warranted piercing the corporate veils of DOT and NPTC, and she sought to hold Leon personally liable for compensatory and punitive damages, and counsel fees.

5

Defendants filed an answer and counterclaim alleging breach of contract — the subordination agreement — conversion, unjust enrichment, breach of the duty of loyalty, and a third-party complaint against plaintiff and Igor alleging conversion, trespass — based on Igor's access of DOT's financial records — and defamation. The case was tried without a jury.

The judge heard the testimony of plaintiff, Igor, Leon, Brescia and other witnesses familiar with DOT's business, and, specifically, the circumstances surrounding the award of the West Point contract. In a written opinion following trial, the judge made specific findings of fact. He concluded that DOT breached the terms of the buy-sell agreement because it failed to repay David's loans to the company within two years of his death. He rejected Leon's claim that David and plaintiff had diverted DOT funds for their personal use over the years, and that this excused DOT's obligation to repay the loans. The judge rejected defendants' assertion that under the circumstances, DOT was only obligated to pay over the $1 million life insurance proceeds. The judge concluded "[t]he undisputed fact is that DOT and the other defendants had absolutely no intention of honoring the [buy-sell] agreement."

The judge then considered how much money David loaned to DOT. In this regard, the judge found "[t]he only reliable and believable evidence came

6

from the testimony of . . . Brescia."  Citing a financial statement prepared by Brescia that "[t]he [c]ompany ha[d] an outstanding loan from its principal stockholder in the amount of $478,863 as of December 31, 2014[,]" and noting it was undisputed Leon never personally loaned money to DOT, the judge concluded this was the amount of plaintiff's damages.

Reviewing caselaw regarding piercing of the corporate veil, the judge found that Leon "totally disregarded corporate formalities[,]" and "diverted funds for his personal use[.]"  He concluded that Leon "made sure to drain the DOT bank account in total disregard of repaying David's loans[,]" and he determined that Leon and NPTC were jointly and severally liable for plaintiff's damages.  He did not specifically find that Leon committed fraud, nor did he address plaintiff's UFTA claim at all.

The judge rejected all of defendants' causes of action against plaintiff and Igor.  He found no breach of the subordination agreement and, moreover, because the West Point project was completed and the bonds were released, the claim was moot. The judge also rejected defendants' generalized allegations that over the years plaintiff and David were unjustly enriching themselves at DOT's expense, noting the payments to plaintiff were "based upon the established protocol since the inception of DOT."  He determined that Leon's belated claim

A-2963-18T4

regarding unpaid rent and utilities was "without merit[,]" since Leon "turned a blind eye to DOT operations until he took over control after David's death." According to the judge, Leon "surely waived any such claims by his indifference."

The court's December 5, 2018 final judgment held DOT, Leon, and NPTC jointly and severally liable to plaintiff for $478,863, plus interest and costs; the judgment also dismissed defendants' counterclaim and third-party complaint and awarded counsel fees, pending submission of an appropriate certification by plaintiff's counsel.

Shortly thereafter, defendants moved for partial relief from the judgment. Citing several trial exhibits in evidence, defendants claimed the judge erred by: 1) concluding Leon made no loans to DOT; and 2) failing to account for payments DOT made after David's death, thereby reducing the outstanding loan balance. Defendants contended that the judgment amount should be $226,030.62.

Plaintiff opposed the motion. She cited Brescia's undisputed testimony that the December 31, 2014 financial statement was accurate. She further contended that the statement's reference to DOT's principal shareholder meant David, since it was undisputed that Leon never made a personal loan to the

company.  Additionally, plaintiff filed a separate motion to amend the judgment to include an award of more than $210,000 in counsel fees and more than $18,000 in costs.

The judge partially granted defendants' motion, modifying the damage award to $459,103.14.  In a written statement of reasons, the judge noted it was "undisputed that DOT paid out $19,759.86 post[-David's] death for plaintiff's benefit[,]" but, he otherwise rejected defendants' claims regarding the amount of the judgment.

In a separate order, the judge denied plaintiff's fee request.  He concluded that no statute or court rule provided for a fee award in these circumstances, and the buy-sell agreement provided for an award only regarding enforcement of any promissory note covering a shortfall between the life insurance proceeds and the true value of David's stock shares.  The judge found that the insurance proceeds greatly exceeded the value of David's DOT stock, no promissory note was ever executed, and, therefore, plaintiff had no contractual claim for counsel fees and litigation costs.

On appeal, defendants assert the judge's factfinding was marred by errors resulting in an inflated award of damages; they again contend that any damage award must be limited to $226,030.62.  They also argue that the judge erred by

piercing the corporate veil and holding Leon personally liable for DOT's debt to David's estate and NPTC liable for DOT's debt.

Regarding their counterclaim and third-party complaint, defendants contend the judge erred by finding: 1) plaintiff did not breach the subordination agreement, or the implied covenant of good faith and fair dealing as to the buy-sell agreement; 2) Leon waived any claim against plaintiff by his "indifference"; and, 3) in dismissing defendants' claims for trespass and defamation. Lastly, defendants challenge evidentiary rulings the judge made during trial.

In her cross-appeal, plaintiff argues the judge misread the buy-sell agreement and should have awarded her counsel fees and costs based on the terms of the promissory note David allegedly executed on DOT's behalf to secure bonding for the West Point project. She also contends that the evidence proved Leon violated the UFTA, and, independently entitles her to an award of counsel fees.

I.

We set some guideposts for our consideration of these arguments. Most importantly, our standard of review following a bench trial is well-known.

> Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review: "we do not disturb the factual findings and legal conclusions of the trial

A-2963-18T4

> judge unless we are convinced that they are so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice[.]"
>
> [Seidman v. Clifton Sav. Bank, SLA, 205 N.J. 150, 169 (2011) (alteration in original) (quoting In re Trust Created By Agreement Dated December 20, 1961, ex. rel. Johnson, 194 N.J. 276, 284 (2008)).]

In reviewing the judge's findings, "[w]e do not weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Mountain Hill, LLC v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App. Div. 2008) (alteration in original) (quoting State v. Barone, 147 N.J. 599, 615 (1997)). However, we owe no deference to the judge's interpretation of the law and the legal consequences that flow from established facts. Manalapan Realty L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995) (citing State v. Brown, 118 N.J. 595, 604 (1990)).

To the extent any of defendants' arguments imply the judge erroneously found a breach of the buy-sell agreement, or plaintiff violated the implied covenant of good faith and fair dealing regarding the buy-sell agreement, or she and David wrongfully diverted DOT funds, those arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E). The

findings made by the judge were supported by the credible evidence at trial and we will not disturb them.

Indeed, defendants' principal argument post-trial was and remains that the amount of the judgment —the amount of unpaid loans David made to DOT — was "inconsistent with the competent, relevant and reasonably credible evidence[.]" Seidman, 205 N.J. at 169. Notably, the judge rejected both sides' claims regarding the dollar amount of outstanding loans. Plaintiff alleged it exceeded $600,000 based on Igor's review of DOT's financial records, although during trial, Igor conceded it could be less; defendants argued the true amount, based on Brescia's testimony and other documents in the record, was $226,030.62.

The judge credited a financial statement Brescia prepared demonstrating that as of December 31, 2014, DOT carried an outstanding loan to its principal stockholder of $478,863. He later adjusted this amount on defendants' motion, recognizing that they were entitled to credits for payments DOT made on account of the loan balance after David's death. The judge found that it was undisputed that Leon never personally loaned any money to DOT, and the reference to "principal stockholder" meant David.

Defendants argue this conclusion was clearly erroneous, because it is undisputed that NPTC made a loan of $250,000 in May 2014, as reflected in a promissory note and other documentary evidence adduced at trial. They argue that the amount of outstanding loans in Brescia's December 2014 statement included the NPTC loan, which was made on behalf of Leon. Defendants also point to an email exchange between Brescia and Igor in December 2014, in which the accountant states after reviewing DOT's financial condition with Leon, "there are . . . two stockholder loan payables of approx[imately] $245[,000] to each shareholder." With some minor adjustments for Leon's other recognized obligations to DOT, defendants contend the judge simply failed to credit Leon's loan (through NPTC) to the figure in the financial statement. At trial, Brescia insisted this was the correct amount, and the December 2014 statement reflected loans outstanding to both brothers, not just David.

However, DOT's December 2013 financial statement, also prepared by Brescia, showed at that time DOT carried more than $500,000 in outstanding loans to its "principal stockholder." Brescia tried to explain this as including loans made to David years earlier by members of his family. On cross-examination, Brescia acknowledged, however, that these intrafamilial loans were carried on DOT's books in accounts that were separate from David's loan

13

account. Defendants do not dispute that Leon, DOT's only other stockholder, never personally loaned the company any money prior to May 2014, when NPTC made a loan.

Moreover, the judge heard the testimony of Leon, Brescia, and David Goldstein, who for many years was DOT's bonding agent and intimately involved in the bonding of the West Point contract. It suffices to say that the testimony raised questions about whether some of the documents prepared for the bonding company's approval accurately reflected the true financial obligations of DOT regarding outstanding loans. At one point, Goldstein believed there was a total of $750,000 in outstanding shareholder loans to DOT that were subordinated to the bonds, i.e., approximately $500,000 received from David, and, after NPTC's infusion of money in spring 2014, $250,000 ostensibly received from Leon.

In short, there was competing evidence adduced by both sides regarding the outstanding loan balance due David's estate. Our role is not to "weigh the evidence, assess the credibility of witnesses, or make conclusions about the evidence." Mountain Hill, LLC, 399 N.J. Super. at 498 (quoting State v. Barone, 147 N.J. 599, 615 (1997)). The trial judge had the witnesses before him, as well as all the documentary evidence. He not only heard the competing arguments

14

of counsel, but he also reconsidered the amount of the judgment upon defendants' motion for partial relief and adjusted the figure accordingly. We cannot conclude that the judge's findings and conclusions "offend the interests of justice" and require reversal. Seidman, 205 N.J. 169.[3]

## II.

"[A] corporation is an entity separate from its stockholders." Lyon v. Barrett, 89 N.J. 294, 300 (1982). "[T]he party seeking an exception to the fundamental principle that a corporation is a separate entity from its principal bears the burden of proving that the court should disregard the corporate entity." Tung v. Briant Park Homes, Inc., 287 N.J. Super. 232, 240 (App. Div. 1996) (citing Touch of Class Leasing v. Mercedes-Benz Credit of Canada, Inc., 248 N.J. Super. 426, 441 (App. Div. 1991)).

---

[3] In a separate sub-point responding to defendants' arguments regarding the amount of the judgment, plaintiff contends the March 12, 2019 amended judgment, which gave defendants credit for payments DOT made on account of David's loans after his passing, provided too much credit to defendants. Plaintiff contends the documentary evidence shows DOT transferred some of these funds before December 31, 2014, and, therefore, credit for those funds are already contained in the bottom-line outstanding loan balance in Brescia's December 2014 financial statement. This argument is not validly raised as part of plaintiff's cross-appeal from the court's separate March 12, 2019 order denying plaintiff counsel fees. We refuse to address it any further.

"The purpose of the doctrine of piercing the corporate veil is to prevent an independent corporation from being used to defeat the ends of justice, to perpetrate fraud, to accomplish a crime, or otherwise to evade the law[.]" State, Dept. of Env't. Prot. v. Ventron Corp., 94 N.J. 473, 500 (1983) (citations omitted). "Personal liability may be imposed upon a controlling stockholder of a close corporation where the controlling stockholder disregards the corporate form and utilizes the corporation as a vehicle for committing equitable or legal fraud." Marascio v. Campanella, 298 N.J. Super. 491, 502 (App. Div. 1997) (citing Walensky v. Jonathan Royce Int'l, Inc., 264 N.J. Super. 276, 283 (App. Div. 1993)).

The judge found Leon "dominated and controlled DOT and NPTC[,]" and that he disregarded corporate formalities. The judge cited "irrefutable evidence that Leon diverted funds for his personal use including purchases of jewelry, his daughter's wedding, his wife's credit card, donations to his temple and . . . past due rent and utility bills." The judge found that Leon paid himself "a whopping" salary of more than $95,000 in calendar year 2016. The judge concluded all of this "drain[ed] the DOT bank account in total disregard of repaying David's loans."

After David's death and his purchase of his brother's stock, Leon was the sole shareholder and officer of <u>both</u> corporations. He clearly "dominated and controlled" both corporations because there was no one else. The lack of corporate formality is certainly not unusual in sole shareholder corporations.

Nor do we find Leon's decision to pay himself a salary or NPTC rent reason to pierce the corporate structure of either DOT or NPTC. Brescia testified that he advised Leon paying rent and utility bills was appropriate, and he discussed continuing the operation of DOT with Leon, particularly since the company had just secured the West Point contract. DOT continued to function as an ongoing business with Leon running the company after David's death. Our review of Leon's trial testimony regarding the personal expenses cited by the judge reveals these were all paid by NPTC, not DOT.

It is undisputed that NPTC and Leon's wife were also creditors of DOT when David died. David's estate was a debtor of DOT, but this imposed no fiduciary duty on Leon. See <u>United Jersey Bank v. Kensey</u>, 306 N.J. Super. 540, 552 (App. Div. 1997) ("The virtually unanimous rule is that creditor-debtor relationships rarely give rise to a fiduciary duty.").

Admittedly, Leon chose to pay off the loans NPTC and his wife made to DOT before paying David's estate. This certainly supported the judge's

17

conclusion that DOT breached the buy-sell agreement, because the agreement obligated DOT to pay David's estate the amount of outstanding loans David made to DOT within two years, and it failed to do so.

Generally speaking, "there must be equitable fraud" to pierce the corporate veil. MacFadden v. MacFadden, 49 N.J. Super. 356, 360 (App. Div. 1958) (citing Irving Inv. Corp. v. Gordon, 3 N.J. 217, 223 (1949)). Equitable fraud "includes 'all acts, omissions or concealments which involve a breach of a legal or equitable duty, trust or confidence justly reposed, and are injurious to another, or by which an undue or unconscientious advantage is taken of another.'" Walensky, 264 N.J. Super. at 283 (quoting MacFadden, 49 N.J. Super. at 360). However, as already noted, the judge did not conclude that Leon's decisions, made as sole shareholder and officer of DOT, to pay off DOT's obligations to NPTC and his wife before paying David's estate, were legally or equitably fraudulent or criminal.

Considering the record as a whole, the judge's findings do not support piercing DOT's corporate veil. We therefore reverse entry of judgment against Leon personally and against NPTC.

III.

We consider the balance of arguments defendants raise regarding other grounds for reversal and dismissal of their counterclaim and third-party complaint.

We agree with the judge that defendants lacked standing to assert a claim that plaintiff breached the subordination agreement with the surety company by paying down some of David's loans and other expenses while the bonds were extant, and the West Point project was ongoing. The subordination agreement was between DOT and the surety company, with David listed as creditor of DOT. David executed the agreement on behalf of DOT. We fail to see how DOT, as defendant, can assert a claim that plaintiff, who continued to write checks as DOT's bookkeeper after the subordination agreement was signed and after her husband's death, was violating the subordination agreement, which inured solely to the surety company's benefit. Nor did defendants prove they were damaged by this alleged breach. Lastly, by the time of trial, the West Point project was completed, and we agree with the judge that any breach of contract claim was moot.

Given the judge's factual findings, we have no reason to reverse dismissal of defendants' claim for trespass. It is undisputed that Igor accessed DOT's

financial reports with his mother's express permission. Pursuant to her job duties, plaintiff routinely accessed and used the very same information, and, we assume, she might just have reasonably produced the information herself. Undoubtedly, plaintiff did not commit a tort by accessing the records, and defendants' argument lacks sufficient merit to warrant further discussion. R. 2:11-3(e)(1)(E).

The defamation claim was supported by the testimony of Leon Sirota, who was married to Leon's wife's niece, and Laura Titievsky, a close friend of plaintiff. Sirota claimed that at a meeting with Igor and another family member, Igor claimed Leon had forged his father's name on a "document" and was going to jail as a result. Titievsky testified that plaintiff told her "Leon forge[d] David's signature after David passed away" and "sign[ed] for David . . . [on] some paperwork."

Leon claims these statements were slander per se. See, e.g., Biondi v. Nassimos, 300 N.J. Super. 148, 154 (App. Div. 1997) (noting that "defamatory statements which impute to another person . . . a criminal offense" may be slander per se). "[A] statement is defamatory if it is false, communicated to a third person, and tends to lower the subject's reputation in the estimation of the community or to deter third persons from associating with him." W.J.A. v. D.A.,

210 N.J. 229, 238 (2012) (alteration in original) (quoting Lynch v. N.J. Educ. Ass'n, 161 N.J. 152, 164–65 (1999)).

The judge's written opinion began with nearly thirty pages setting forth the factual contentions of both parties. Clearly, plaintiff questioned the authenticity of the promissory notes and subordination agreement allegedly signed by David and introduced at trial. The judge dismissed defendants' defamation claim finding Leon failed to prove "special damages," or that he suffered in his personal or business relationships. However, if a plaintiff proves slander per se, he is entitled to "presumed damages . . . 'which are normal and usual and are to be anticipated when a person's reputation is impaired.'" Id. at 239 (quoting Prosser & Keeton on Torts § 116A at 843 (5th ed. 1984)). "Presumed damages are a procedural device which permits a plaintiff to obtain a damage award without proving actual harm to his reputation." Ibid. (citing Rodney A. Smolla, Law of Defamation § 9:17 (2d ed. 2008)).

The judge also reasoned that "Igor's alleged statements were made in a settlement conference" and subject to the immunity provided by the litigation privilege. See Hawkins v. Harris, 141 N.J. 207, 216 (1995). Leon appropriately points out that Sirota was not authorized to settle anything, and, by his own testimony, was at the meeting at the urging of another family member to try and

bring peace to the two warring factions of the Roitburg family.  He was not a "litigant[] or other participant[]" in a "judicial or quasi-judicial proceeding[] . . . authorized by law . . . to achieve the objects of the litigation[.]"  Ibid.

However, the judge never made a finding as to the credibility of Sirota or Titievsky, i.e., that plaintiff or Igor actually made these statements, nor did he ever find that the nub of the alleged statements, i.e., Leon forged David's name on certain documents, was false.   Truth is an absolute defense to a defamation claim, Ward v. Zelikovsky, 136 N.J. 516, 530 (1994), and "may be asserted as a defense even when a statement is not perfectly accurate." G.D. v. Kenny, 205 N.J. 275, 293 (2011).

Moreover, "[w]hen the publication of defamatory matter has been invited, instigated or procured by the one defamed, or by someone acting on his behalf, he generally cannot be heard to complain of the resulting injury."  30 River Ct. E. Urb. Renewal Co. v. Capograsso, 383 N.J. Super. 470, 478 (App. Div. 2006) (alteration in original) (emphasis added) (quoting Mick v. Am. Dental Ass'n, 49 N.J. Super. 262, 275 (App. Div. 1958)).  Here, the comments allegedly made by Igor and plaintiff were made to two individuals, knowledgeable of the intrafamily dispute and desirous of trying to resolve it.  They were both family members or considered family.   Under the circumstances, the requisite

publication of the allegedly defamatory remarks to a third-party was lacking. We affirm the dismissal of the defamation count for reasons other than those expressed by the trial judge. See Hayes v. Delamotte, 231 N.J. 373, 387 (2018) ("[I]t is well-settled that appeals are taken from orders and judgments and not from opinions, oral decisions, informal written decisions, or reasons given for the ultimate conclusion." (quoting Do-Wop Corp. v. City of Rahway, 168 N.J. 191, 199 (2001))).

Defendants argue the judge erroneously limited the testimony of several defense witnesses by not allowing them to testify to statements David made while alive because they were hearsay, and by nevertheless allowing Igor to testify about conversations he had with David prior to his death. Specifically, defendants argue the judge failed to consider the evidence as an exception to the hearsay rule. See N.J.R.E. 804(b)(6) (permitting admission in civil cases of "a statement made by a person unavailable as a witness because of death if the statement was made in good faith upon declarant's personal knowledge in circumstances indicating that it is trustworthy"). Defendants also contend the judge permitted certain records to be admitted during Igor's testimony as business records, even though Igor never worked for DOT.

"[O]rdinarily, an evidentiary determination made during trial is entitled to deference and is to be reversed only on a finding of an abuse of discretion[.]" Estate of Hanges v. Metro. Prop. & Cas. Ins. Co., 202 N.J. 369, 374 (2010). "However, no deference is accorded when the court fails to properly analyze the admissibility of the proffered evidence." E&H Steel Corp. v. PSEG Fossil, LLC, 455 N.J. Super. 12, 25 (App. Div. 2018) (citing Konop v. Rosen, 425 N.J. Super. 391, 401 (App. Div. 2012)). In those situations, our review of the evidentiary ruling is de novo. Konop, 425 N.J. Super. at 401.

We have carefully reviewed defendants' citations to the trial transcript as set forth in their brief. In most cases, there was no objection, and most do not involve testimony regarding statements made by David. In any event, to the extent inadmissible evidence crept into the trial, its admission surely did not lead to an unjust result. See Green v. N.J. Mfrs. Ins. Co., 160 N.J. 480, 502 (1999) (requiring appellate court to consider if erroneous decision to admit certain evidence "was 'clearly capable of producing an unjust result'" (quoting R. 2:10-2)).

IV.

We turn our attention to the points raised in plaintiff's cross-appeal.

## A.

Plaintiff contends the judge correctly awarded counsel fees in the original judgment, but then erroneously denied any fee award in the separate March 12, 2019 order deciding plaintiff's motion. In his statement of reasons supporting the original judgment, the judge offered no explanation for the basis of the fee award. In support of the subsequent order denying any award, the judge found there was no basis for an award of counsel fees under Rule 4:42-9(a). We agree.

Rule 4:42-9(a) provides exceptions to the American Rule that generally prohibits fee shifting. In re Niles Trust, 176 N.J. 282, 293–94 (2003). None of the exceptions in the Rule apply to this case.

The judge also concluded that the only provision in the buy-sell agreement, the basis of plaintiff's breach of contract claim, permitting an award of counsel fees was limited to collection costs on any note DOT issued as a shortfall between the $1 million life insurance proceeds and the actual value of the deceased shareholder's stock. The judge properly concluded, and plaintiff does not assert otherwise, that there was no such shortfall.

Plaintiff instead contends the judge's reliance on this provision in the buy-sell agreement was a mistake. She argues that under another provision of the buy-sell agreement — the one the judge determined defendants breached —

DOT was obligated to pay off David's loan within two years of his death. Plaintiff contends that the promissory note DOT allegedly issued in David's favor reflecting a $250,000 loan balance contained a provision for an award of fees if litigation to collect ensued, and plaintiff prevailed.

It is recognized that regardless of the provisions of Rule 4:42-9(a), "[a]ttorney's fees may be allowed where the parties have agreed thereto in advance . . . in a promissory note . . . or other agreement or contract[.]" Pressler & Verniero, Current N.J. Court Rules, cmt. 2.10 on R. 4:42-9 (2021). However, as we already noted, the judge never decided a contested issue at trial, i.e., whether the promissory note was authentic. It was plaintiff who challenged its authenticity and whether it was conclusive evidence of David's total loan balance, as defendants argued. In short, plaintiff never sought to enforce the note. We therefore affirm on this point in the cross-appeal.

### B.

Plaintiff argues that defendants violated the UFTA when Leon transferred monies from DOT while the corporation owed David's estate repayment of loans David made to the company. The judge never addressed the count in plaintiff's complaint alleging a violation of the UFTA.

The UFTA "prevent[s] a debtor from placing his or her property beyond a creditor's reach" and from "deliberately cheat[ing] a creditor by removing his property from the 'jaws of execution.'" Gilchinsky v. Nat'l Westminster Bank N.J., 159 N.J. 463, 475 (1999) (citations omitted). "Plaintiff bears the burden of proving the transfer was fraudulent by clear and convincing evidence." Jecker v. Hidden Valley, Inc., 422 N.J. Super. 155, 164 (App. Div. 2011) (citing Barsotti v. Merced, 346 N.J. Super. 504, 520 (App. Div. 2002)).

The court must consider certain "factors commonly referred to as 'badges of fraud.' 'Badges of fraud' represent circumstances that so frequently accompany fraudulent transfers that their presence gives rise to an inference of intent." Gilchinsky, 159 N.J. at 476. These "badges of fraud" are set forth in N.J.S.A. 25:2-26. Jecker, 422 N.J. Super. at 164.

> The remedies available to a successful claimant under the UFTA are broad. Obviously, avoidance of the transfer is primary. N.J.S.A. 25:2-29(a)(1). Other remedies include attachment against the asset transferred or other property of the transferee, N.J.S.A. 25:2-29(a)(2); a money judgment against the transferee where the transfer cannot be undone, N.J.S.A. 25:2-30(a), (b); and injunctive relief. N.J.S.A. 25:2-29(a)(3)(a). The statute also contains a catch-all provision, affording a creditor "[a]ny other relief the circumstances may require." N.J.S.A. 25:2-29(a)(3)(c).
>
> [Banco Popular N. Am. v. Gandi, 184 N.J. 161, 176–177 (2005) (alteration in original).]

Plaintiff urges us to essentially exercise our original jurisdiction, see Rule 2:10-5, and find clear and convincing evidence that defendants violated the UFTA. She further asserts that such a finding independently justifies an award of counsel fees commensurate with the application submitted to the trial judge post-verdict. As we already said, the trial judge had the opportunity to see and hear the witnesses and consider all the voluminous documentary evidence. We cannot discern why he failed to address the issue, but we refuse to exercise original jurisdiction, particularly given plaintiff's enhanced burden of proof under the UFTA.

We remand the matter to the Law Division specifically to address plaintiff's UFTA cause of action, something the trial judge did not do. We leave the conduct of the remand to the judge's discretion, and we do not retain jurisdiction.

In summary, on the appeal, we affirm the judgment in all respects, except we order the trial court to vacate the judgment as to Leon and NPTC.

On the cross-appeal, we affirm, but remand the matter to the trial court to consider plaintiff's UFTA cause of action against defendants. We express no opinion on the merits of the UFTA claim.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2963-18T4