788 A.2d 802 (2002)
346 N.J. Super. 504
Glen BARSOTTI, Plaintiff-Appellant,
v.
Aurelio MERCED, Material Adjustment Corp, Joni Walsh Esquire, Karcher, Salmond, Rainone & Barrett, Defendants, and
Jose Laboy, Esquire, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Argued December 12, 2001.
Decided January 16, 2002.
*804 Alfred T. Sanderson, Woodbury, argued the cause for appellant.
John P. Morris, Cumberland, argued the cause for respondent.
Before Judges KING, WECKER and WINKELSTEIN.
*803 The opinion of the court was delivered by WINKELSTEIN, J.A.D.
Defendant Jose LaBoy, Esq. is an attorney who represented defendant Aurelio Merced personally in a claim against Merced by plaintiff to recover damages for injuries plaintiff suffered in a car accident with Merced. Plaintiff claims LaBoy conspired with Merced to place Merced's assets out of plaintiff's reach as a potential creditor. Plaintiff appeals an order of the trial judge granting LaBoy's motion to dismiss plaintiff's complaint at the end of plaintiff's case pursuant to R. 4:37-2(b). We find no merit to the appeal and affirm.

I
Plaintiff filed a complaint against defendant Aurelio Merced[1] on November 22, 1993, alleging negligence for injuries arising out of a motor vehicle accident. On June 8, 1995 mandatory arbitration was held and defendant was found 100% liable. Damages were assessed at $225,000. Defendant appealed the arbitrators' award. On August 11, 1995 summary judgment was granted in favor of plaintiff on the issue of liability.
On October 19, 1995 plaintiff filed an amended complaint naming as additional defendants Joni M. Walsh, Esq., Merced's insurance defense attorney; Karcher, Salmond, Rainone & Barrett ("the Karcher firm"), the firm with which Walsh was associated; Material Damage Adjustment Corp. ("Material Damage"), the adjusting company for Merced's insurance company; and Jose LaBoy, Esq., Merced's personal attorney. The amended complaint alleges that the defendants, jointly and individually, misrepresented Merced's insurance policy limits and financial condition in an attempt to induce plaintiff to settle the case for an artificially low amount. LaBoy was also alleged to have assisted Merced to place the proceeds from the sale of his home out of plaintiff's reach as a creditor in the event plaintiff prevailed in the lawsuit.
The claims against the Karcher firm, Material Damage and Walsh were dismissed prior to trial. LaBoy is the only remaining defendant. Plaintiff has been paid Merced's policy limits, $25,000, for the injuries he received in the automobile accident.
Trial began on May 24, 2000, before Judge Curio and a jury. At the close of plaintiff's case LaBoy moved for involuntary *805 dismissal under R. 4:37-2(b). The judge granted the motion on June 19, 2000. Plaintiff timely filed a R. 4:49-2 motion for reconsideration which was denied on August 4, 2000.

II
Plaintiff and Merced were involved in a motor vehicle accident on June 23, 1992. Plaintiff, who was driving a motorcycle, claimed that Merced, who was driving an automobile, failed to yield at an intersection and caused a collision with plaintiff. Plaintiff sustained serious injuries to his right leg as a result of the accident. He has undergone at least four surgeries. Plaintiff filed a complaint alleging negligence on the part of Merced, seeking damages. Merced was represented by Walsh who was assigned by Merced's automobile insurance carrier. LaBoy represented Merced personally for any potential excess liability above the policy limits.
At trial, plaintiff testified concerning the facts surrounding the accident and his injuries. LaBoy did not testify in person, but portions of his deposition were read to the jury.[2] LaBoy testified that the Merceds came to his office shortly before a scheduled settlement for the sale of their home and "asked our office to prepare a deed and he also asked us to attend settlement." Merced owned the house jointly, by the entireties, with Haydee. At the time LaBoy was hired to prepare the deed for the sale of the house, he had no conversations with Merced concerning Merced's assets or the impact that the sale of the house would have upon the lawsuit. LaBoy had previously been contacted by Merced concerning representation in the automobile accident. Merced had brought LaBoy the summons and complaint; LaBoy told Merced to send it to his insurance carrier who would provide an attorney to represent him in the lawsuit. The carrier later contacted Merced and advised him to obtain private counsel since the claim could exceed his $25,000 policy limits. Merced then retained LaBoy.
LaBoy testified that although he helped the Merceds convey title to the property, by preparing the deed and attending settlement, he did not know what other assets they owned. He said he never considered that the house was being conveyed to defraud plaintiff out of the chance to collect a future judgment if plaintiff was successful in the lawsuit. While it is unclear when the deed was actually prepared, it was dated November 30, 1994, the settlement date.
Previously, on July 31, 1993, at the request of plaintiff's counsel, LaBoy assisted Merced to complete a "fill-in the blank" affidavit, which stated, in pertinent part, that Merced had not transferred any assets since the date of the accident and that at the time of the accident, his insurance coverage was "$15,000/$30,000." The amount of Merced's coverage was actually $25,000, which was known to plaintiff as early as January 25, 1993 when the policy limits had been offered and rejected by plaintiff's counsel.
On November 30, 1994 Merced and Haydee sold their home for $85,000. LaBoy was not involved in negotiating the contract price or preparing the contract of sale. There is no evidence that the sale *806 was other than an arms-length transaction for full value. The settlement proceeds were disbursed to pay off a $41,537.78 mortgage loan to Greentree Trust, and for additional closing expenses of $6,795.91, including a $5,100 real estate commission. The net cash paid to the Merceds at settlement was $37,017.95. At closing, LaBoy received a $350 fee for his services.
Subsequent to settlement, the Merceds executed the settlement check and cashed it in Tampa, Florida. The check was "apparently negotiated by them," as well as their daughter Elizabeth Hamilton. They had no bank account in Florida. There is no evidence in the record that before the check was cashed LaBoy knew of or discussed with the Merceds what they would do with the sale proceeds.
On May 10, 1995, after the house was sold, but prior to the arbitration proceedings in June 1995, LaBoy assisted Merced in completing an affidavit at Walsh's request. The affidavit stated:
1. My name is Aurelio Merced. I am presently 67 years old. I am married to Hayd[ee] Merced, who is 66 years old. We are presently residing at the Buena Vista Campground Trailer Park, Buena Vista, New Jersey. We are paying $400.00 in rent a month for a two bedroom trailer.
2. Our only source of income is social security. I am receiving $780.00 a month, and my wife is receiving $400.00 a month for a total of $1,180.00 a month. From that amount, I paid the rent, groceries, estimated at $325.00, electric estimated at $35.00, propane gas estimated at $50.00 a month. We have no telephone.
3. My wife and my sole possessions are the clothes we wear, our 1985 pickup truck, and a bed that my wife and I sleep in. The furniture in the trailer was a gift from one of our children.
4. We own no real estate; have no savings accounts; no CDS; no stocks; no bonds; no profit sharing.
5. In addition to the social security benefits, I am also receiving $136.00 a month as pension benefit payments from my ex-employer, Shieldalloy Corporation.
6. I hereby certify that the aforementioned statements made by me are true and correct. I am aware that, if any part of this statement is wilfully false, I am subject to punishment.
In the amended complaint it was alleged that LaBoy committed "malpractice and that he deliberately misrepresented to plaintiff the true financial condition of defendant, Aurelio Merced," that "he deliberately misrepresented facts with the intention that plaintiff should rely thereon and should settle this case for policy limits," that he violated Rule of Professional Conduct (RPC) 1.2(c) in that he assisted Merced in conduct that he knew was "illegal, criminal or fraudulent," and that he "prepared written instruments containing items that he knew or should have known are expressly prohibited by law." Specifically, it was alleged that LaBoy assisted Merced in preparing and sending false affidavits concerning his insurance coverage limits and his financial worth, i.e., the July 31, 1993 and the May 10, 1995 affidavits. Plaintiff alleged that all of the defendants participated in "a joint effort in the nature of a conspiracy to defraud plaintiff by false and fraudulent misrepresentation of facts designed to induce plaintiff to accept policy limits."
In November 1999 Merced died.

III
At the close of plaintiff's case LaBoy moved for and was granted an involuntary dismissal pursuant to R. 4:37-2(b). *807 Our review of such a motion is the same as that applied by the trial court. Tannock v. New Jersey Bell Tel. Co., 223 N.J.Super. 1, 6, 537 A.2d 1307 (App.Div.1988). We "must examine the evidence, together with legitimate inferences which can be drawn therefrom, and determine whether the evidence could have sustained a judgment in favor of the party who opposed the motion." Ibid.; see also Pressler, Current N.J. Court Rules, comment 2 on R. 4:37-2(b) (2002). Although we do not completely agree with the trial judge's analysis, we agree with her conclusion that plaintiff failed to present a prima facie casethat all of the evidence, including favorable inferences to be drawn therefrom, could not sustain a judgment in plaintiff's favor.

IV
In assessing plaintiff's claim that LaBoy acted in concert with Merced to commit a fraud upon plaintiff, we begin with the allegation that assisting Merced to prepare the July 31, 1993 affidavit, indicating the policy limits were $15,000/$30, 000 per accident, was a fraudulent act. To maintain a cause of action based upon common law fraud a plaintiff must prove (1) a material misrepresentation of a present or past fact, (2) with knowledge of its falsity, and (3) with the intention that the other party rely thereon, with a result that (4) the other party reasonably relied thereon, (5) to that party's detriment. Gennari v. Weichert Co. Realtors, 148 N.J. 582, 610, 691 A.2d 350 (1997) citing Jewish Ctr. of Sussex Cty. v. Whale, 86 N.J. 619, 624-25, 432 A.2d 521 (1981); Model Jury Charge (Civil) § 3.19 (February 1992). Here, there is no dispute, nor any allegation for that matter, that plaintiff relied on the $15,000/$30,000 policy limit figure set forth in the July 31, 1993 affidavit. By that time, plaintiff was already aware of the $25,000 policy limits and had rejected a settlement for that amount. In the absence of proofs that plaintiff relied on the affidavit, common law fraud is not established.

V
We next decide whether assisting the Merceds to transfer the marital home on November 30, 1994 renders LaBoy liable to plaintiff. Plaintiff argues that when LaBoy assisted the Merceds in the transfer of their home, LaBoy conspired with them to place the property out of plaintiff's reach as a potential creditor. The trial judge rejected plaintiff's claim, finding that the Uniform Fraudulent Transfer Act (UFTA), N.J.S.A. 25:2-20 to-34, does not apply to transfers of property held as tenancies by the entireties because property held by the entireties does not qualify as an asset under the UFTA. Plaintiff claims the trial judge erred, first by applying the UFTA rather than the Uniform Fraudulent Conveyance Act (UFCA), N.J.S.A. 25:2-7 to-19 (now repealed). He asserts that the latter statute, specifically N.J.S.A. 25:2-7, contains a broader definition of "asset" than does the UFTA, and would include a tenancy by the entireties as an asset for purposes of fraudulent conveyances. Plaintiff argues that the date the tenancy by the entireties was created, rather than the date of the transfer of the property, determines which act applies. And since the Merceds' tenancy by the entireties was created in 1987, even though the house was sold after the effective date of the UFTA, the UFCA applies. Alternatively, plaintiff claims that even if the UFTA does apply, the trial judge erred by concluding that tenancies by the entireties are not subject to the UFTA.
The UFTA was made effective January 1, 1989. According to the Senate, Labor, Industry & Professions Statement, Assembly No. 1265 L.1988, Chapter 74, the bill *808 expressly repealed the UFCA and replaced it with the UFTA. We find no evidence in the UFTA or its legislative history which would render it inapplicable to an estate created before it was passed, but transferred after its effective date. It is the fraudulent transfer that the UFTA was passed to prevent, not the creation of the tenancy in the first instance. See Gilchinsky v. National Westminster Bank N.J., 159 N.J. 463, 475, 732 A.2d 482 (1999) (citing Klein v. Rossi, 251 F.Supp. 1, 2 (E.D.N.Y.1966), and Hearn 45 St. Corp. v. Jano, 283 N.Y. 139, 27 N.E.2d 814, 816 (1940)).
In support of his argument that the UFCA rather than the UFTA applies, plaintiff cites Vander Weert v. Vander Weert, 304 N.J.Super. 339, 345, 700 A.2d 894 (App.Div.1997), and Freda v. Commercial Trust Co. of New Jersey, 118 N.J. 36, 40, 570 A.2d 409 (1990). His reliance on Vander Weert and Freda is, however, misplaced. Neither of these cases involve an analysis of either the UFTA or the UFCA; rather, each addresses N.J.S.A. 46:3-17.4, which concerns a spouse's ability to alienate an interest in a tenancy by the entireties during the marriage without the written consent of the other spouse. The Legislature expressly provided when N.J.S.A. 46:3-17.4 was approved on January 5, 1988, that it "shall take effect on the ninetieth day after enactment and shall be applicable to all tenancies by the entireties which are created on or after the effective date of this act." Freda, 118 N.J. at 40, 570 A.2d 409 (citing L. 1987, c. 57 § 10). The UFTA does not contain similar language and is thus not analogous. Rather, we conclude the UFTA is applied to alleged fraudulent transfers occurring after the effective date of the UFTA. See In re Fleet, 122 B.R. 910 (Bankr.E.D.Pa.1990). We therefore analyze plaintiff's claims under the UFTA.
N.J.S.A. 25:2-25 states:
A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before of after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
a. With actual intent to hinder, delay, or defraud any creditor of the debtor; or
b. Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
(1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.
The UFTA "prevent[s] a debtor from placing his or her property beyond a creditor's reach." Gilchinsky, 159 N.J. at 475, 732 A.2d 482. (citation omitted). "[A] debtor cannot deliberately cheat a creditor by removing his property from `the jaws of execution.'" Ibid. (quoting Klein, 251 F.Supp. at 2). To determine whether a transfer constitutes a fraudulent conveyance, the court looks at two criteria. First, "whether the debtor [or person making the conveyance] has put some asset beyond the reach of creditors which would have been available to them at some point in time `but for the conveyance.'" Ibid. (quoting In re Wolensky's Ltd. P'ship., 163 B.R. 615, 626-27 (Bankr.D.C.1993)). Second, the court looks at "whether the debtor transferred property with an intent to *809 defraud, delay, or hinder the creditor." Id. at 476. The individual who seeks "to set aside the conveyance bears the burden of proving actual intent." Ibid. (citations omitted).
A fraudulent transfer is defined under the UFTA:
A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

[N.J.S.A. 25:2-27a (emphasis added).]
Although the trial judge concluded the UFTA does not apply to tenancies by the entireties and dismissed the complaint, we need not reach that issue because plaintiff did not present a prima facie case of a fraudulent transfer to survive a R. 4:37-2(b) motion.
Here, the gross sales price for the Merceds' house was $85,000. At trial, there was no proof that Merced transferred the house without receiving a reasonably equivalent value in exchange for the transfer. There is no indication that the buyer was related to the Merceds or that the transaction was not otherwise an arms-length transaction. Thus the test of culpability under N.J.S.A. 25:2-27a, that the transfer was made without receiving reasonable value in exchange, has not been met.
Additionally, the sale of the house could not be said to have caused Merced to become insolvent. After paying off a mortgage and various settlement expenses, the Merceds received approximately $37,000. Said another way, there was equity in the house of approximately $37,000. When the house was sold, the equity was exchanged for cash in a like amount. There was no net change in the value of the Merceds' assets; they exchanged a house with a net equity of $37,000 for $37,000 in cash. The Merceds did not become insolvent as a result of the transfer. Therefore, even considering the facts in a light most favorable to plaintiff, the transfer of the house was not fraudulent as defined under the UFTA.

VI
The next question then becomes whether LaBoy conspired with Merced to deprive plaintiff of the consideration ($37,000) received by the Merceds as a result of the sale of the house. There is no evidence to support this allegation. The Merceds received a check at settlement for the proceeds from the sale. They took the check to Florida where it was cashed. There is not one scintilla of evidence in the record from which a jury could infer that LaBoy discussed with the Merceds what they would do with the money after the house was sold. Perhaps the Merceds did intend to hide the money from plaintiff. However, even assuming they did, there is no evidence to implicate LaBoy in such a plan. Although the nature of a conspiracy is such that more often than not the only type of evidence available to prove the conspiracy is circumstantial, without speculation, the evidence that LaBoy represented the Merceds at closing and was aware of the pending lawsuit is not sufficient from which to draw a reasonable inference that LaBoy played any part in secreting the money from plaintiff. See Board of Education of Asbury Park v. Hoek, 38 N.J. 213, 239, 183 A.2d 633 (1962) (a verdict may not be based upon pure speculation) (citations omitted); Morgan v. Union County, 268 N.J.Super. 337, 364-66, *810 633 A.2d 985 (App.Div.1993), certif. denied, 135 N.J. 468, 640 A.2d 850 (1994).
In the absence of proof that LaBoy was party to a plan to deprive plaintiff of the proceeds of the sale of the house, plaintiff appears to take the position that once the house was sold, LaBoy had an obligation to plaintiff to make sure that the money was available in the event plaintiff obtained a judgment against the Merceds. We disagree. While attorneys may have a duty to third parties under certain circumstances, Petrillo v. Bachenberg, 139 N.J. 472, 483-84, 655 A.2d 1354 (1995), the facts in this case do not support such a duty.
An attorney's defined liability to third parties "comports with general principles of tort law." Id. at 484, 655 A.2d 1354. Cases holding that an attorney owes a duty to a non-client are rather fact specific. The Petrillo Court, quoting from section 552(1) of the Restatement (Second) of Torts (1977), determined that pecuniary liability could be found for negligent misrepresentation "when an attorney `supplies false information for the guidance of others in their business transactions, ... if [the attorney] fails to exercise reasonable care or competence in obtaining or communicating the information.'" Ibid. The Court recognized that attorneys may owe a limited duty in favor of specific non-clients. Id. at 479, 655 A.2d 1354. These cases involve: buyer-seller relationships and opinion letters, id. at 486-88, 655 A.2d 1354, (finding that a duty to a non-client existed where the attorney prepared an incomplete report of percolation tests and a prospective purchaser relied on it in deciding to buy a house); the preparation of financial documents, Atlantic Paradise Assocs., Inc. v. Perskie, Nehmad & Zeltner, 284 N.J.Super. 678, 666 A.2d 211 (App.Div. 1995) (holding a duty existed when the attorney incorrectly prepared amendments to a public offering statement), certif. denied, 143 N.J. 518, 673 A.2d 276 (1996); a breach of a fiduciary duty, Albright v. Burns, 206 N.J.Super. 625, 503 A.2d 386 (App.Div.1986) (holding an attorney liable to an estate of a decedent where the attorney had aided in transactions involving a holder of the decedent's power of attorney); an intent to benefit a third party, Stewart v. Sbarro, 142 N.J.Super. 581, 593, 362 A.2d 581 (App.Div.) (finding a duty where an attorney for buyers of stock did not advise seller's attorney that he had failed to obtain necessary signatures), certif. denied, 72 N.J. 459, 371 A.2d 63 (1976). These cases, which describe when a duty is owed by an attorney to a third party, are distinguishable from the present case.
Here, plaintiff's claim that LaBoy had an obligation to somehow protect the proceeds from the sale of the home for plaintiff's benefit, goes well beyond an attorney's duty to a third party. Once settlement was completed, the proceeds belonged to his clients, the Merceds, not LaBoy himself. As long as LaBoy did not actively conceal or alienate the proceeds from plaintiff, he had no obligation to report to plaintiff that the Merceds came into possession of $37,000 in cash from the sale of their home. He did not supply false information for plaintiff's guidance. The facts of the case do not evidence reliance by plaintiff upon any action LaBoy took or failed to take. The trial judge therefore properly granted defendant's motion for involuntary dismissal on this issue.

VII
The next issue concerns the May 1995 affidavit. Subsequent to closing, the following May, LaBoy assisted Merced in preparation of an affidavit in which Merced stated that he owned no real estate, had no savings accounts, certificates of deposit, stocks, bonds or profit-sharing *811 plans. There was no evidence at trial from which a jury could conclude that the affidavit was false. According to Merced, in May 1995 when the affidavit was executed, he had no assets. LaBoy testified that he prepared the affidavit based upon information provided to him by Merced. There are no proofs in the record to show that Merced had assets in May 1995, or that if he did, LaBoy was or should have been aware that he did. It may be that the $37,000 received by the Merceds at closing was expended between November 30, 1994 and May 10, 1995 for their living expenses. Moreover, only one-half of the proceeds from the sale of the house belonged to Merced. See Fort Lee Savings & Loan Assoc. v. Li Butti, 55 N.J. 532, 264 A.2d 33 (1970). And since Haydee was not a party to plaintiff's lawsuit, at best plaintiff would only have had a claim to approximately $18,500. Plaintiff failed to prove that Merced's share of the proceeds was not used for living expenses in the six-month period between November 30, 1994 and May 10, 1995, or that Merced did not use the money for some other legitimate purpose. Plaintiff, in essence, asked the jury to speculate that LaBoy was aware that Merced was secreting the cash or had disposed of it with the intent to defraud plaintiff. The proofs are simply not sufficient to allow a factfinder to draw a reasonable inference that the funds were disposed of in an effort to defraud plaintiff, which is a necessary element of plaintiff's cause of action to survive a motion pursuant to R. 4:37-2(b).

VIII
Plaintiff also argues that the trial judge improperly applied the clear and convincing standard to his fraud claim, rather than the preponderance of the evidence standard. Plaintiff's argument is without merit. It is well established that fraud must be proven by "clear and convincing" evidence. See Bears v. Wallace, 59 N.J. 444, 450, 283 A.2d 740 (1971); Dixon v. Eckert, 117 N.J. Eq. 544, 545, 176 A. 560 (1935); New Jersey Econ. Dev. Auth. v. Pavonia Rest., Inc., 319 N.J.Super. 435, 445, 725 A.2d 1133 (App.Div. 1998); Stochastic Decisions, Inc. v. DiDomenico, 236 N.J.Super. 388, 395, 565 A.2d 1133 (App.Div.1989), certif. denied, 121 N.J. 607, 583 A.2d 309 (1990); Albright v. Burns, 206 N.J.Super. 625, 636, 503 A.2d 386 (App.Div.1986); Minter v. Bendix Aviation Corp., 26 N.J.Super. 268, 274, 97 A.2d 715 (App.Div.1953). The judge properly applied the clear and convincing standard to this case.

IX
Finally, plaintiff pleads a cause of action based on LaBoy's alleged failure to comply with RPCs 1.2(d) and 1.6(b)(1). RPC 1.2(d) provides:
A lawyer shall not counsel or assist a client in conduct that the lawyer knows is illegal, criminal or fraudulent, or in the preparation of a written instrument containing terms the lawyer knows are expressly prohibited by law, but a lawyer may counsel or assist a client in a good faith effort to determine the validity, scope, meaning or application of the law.
Further, RPC 1.6(b)(1) states:
A lawyer shall reveal such information to the proper authorities, as soon as, and to the extent the lawyer reasonably believes necessary, to prevent the client (1) from committing a criminal, illegal or fraudulent act that the lawyer reasonably believes is likely to result in ... substantial injury to the financial interest or property of another.
The judge properly concluded that "[i]nsofar as the plaintiff's expert attributes responsibility to LaBoy by virtue of violation *812 of the RPCs that claim is dismissed under the holding in Baxt v. Liloia." In Baxt v. Liloia, 155 N.J. 190, 197, 714 A.2d 271 (1998), the Court examined "whether a violation of the Rules of Professional Conduct can be used to provide a basis for civil liability against an adversary's attorney." The Court declined to hold "that the RPCs in themselves create a duty or that a violation of the RPCs, standing alone, can form the basis for a cause of action." Id. at 201, 714 A.2d 271. The trial judge therefore properly granted defendant's motion for involuntary dismissal on this issue.
Affirmed.
NOTES
[1] Aurelio Merced's wife, Haydee, is not a party to the lawsuit. References in this opinion to Merced are to Aurelio. Where necessary, Haydee will be referred to separately.
[2] We have not been provided with the entire trial transcript. We have received the transcript of the May 24, 2000 proceeding, as well as a portion of the May 30 transcript which included the trial judge's decision to dismiss the complaint. Plaintiff has not supplied the May 26 transcript nor the balance of the transcript of May 30. Our opinion is based upon the facts set forth in the transcripts received, as well as the references to the facts included in the parties' briefs.