**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3247-20

MAJEK INVESTMENTS LLC,

    Plaintiff-Appellant,

v.

CONVENTUS, LLC,

    Defendant,

and

PASSAIC MAIN NORSE LLC,
ELIZABETH CATHERINE
VENTURES LLC, LL REO
VENTURES LLC, ELIZABETH
LOUISA VENTURES LLC,
PLAINFIELD PA VENTURES
LLC, NEXUS CAPTIAL
INVESTMENTS, LLC, and
PRIVCAP FUNDING, LLC,

    Defendants-Respondents.

_____

Argued October 23, 2023 – Decided November 28, 2023

Before Judges Sabatino, Mawla and Vinci.

On appeal from the Superior Court of New Jersey, Chancery Division, Union County, Docket No. C-000138-19.

Haralampo Kasolas argued the cause for appellant (Brach Eichler LLC, attorneys; Haralampo Kasolas, of counsel and on the briefs).

Abraham S. Beinhorn argued the cause for respondent Nexus Capital Investments, LLC (Jacobowitz, Newman, Tversky LLP, attorneys; Abraham S. Beinhorn and Evan M. Newman, on the brief).

Timothy Patrick Duggan argued the cause for respondent Privcap Funding, LLC (Stark & Stark PC, attorneys; Timothy Patrick Duggan, of counsel and on the brief).

PER CURIAM

Plaintiff Majek Investments, LLC ("Majek") appeals from the trial court's order denying its motion for summary judgment and granting summary judgment to defendants Nexus Capital Investments, LLC ("Nexus") and Privcap Funding, LLC ("Privcap"), and an order denying its motion for reconsideration. Based on our review of the record and the applicable principles of law, we affirm.

I.

We summarize the facts developed in the record on the parties' cross-motions for summary judgment.[1]

A.

Majek alleged the following facts. On March 19, 2019, Majek entered into a commercial loan agreement with Norse Holdings, LLC ("Norse"), in the principal amount of $750,000 (the "Majek Loan"). The Majek Loan was secured by a promissory note executed by Norse. Norse is one of many companies affiliated with Seth Levine ("Levine"). The Majek Loan was also secured by a guaranty of payment and performance executed by Levine and his wife, Shira Levine. The Majek Loan was further secured by a pledge and security agreement executed by Levine and his wife granting Majek a security interest in Hillside Norse, LLC ("Hillside"), another company affiliated with Levine. At Levine's direction, Majek wired the proceeds of the Majek Loan to an account owned by Hillside.

Majek contended, following receipt of the Majek Loan proceeds, its borrower, Norse, made several fraudulent transfers to respondents Nexus and Privcap. Majek alleges Norse made three outgoing wire transfers to Nexus on

[1] The record indicates certain documents were filed under seal. At oral argument on appeal, counsel stipulated the court can refer to any documents in the record.

A-3247-20

April 19, May 8, and May 15, 2019, in the total amount of $1,503,000 to satisfy loans Nexus made to Levine individually. Majek alleges Norse made five outgoing wire transfers to Privcap as follows: (1) March 19, 2019, in the amount of $14,000; (2) March 25, 2019, in the amount of $177,345; (3) April 19, 2019, in the amount of $34,000; and (4) two on May 22, 2019, in the total amount of $700,000.

Majek contended that on May 1, 2019, Norse had balances in its TD Bank accounts of $48,318.61 and $29,055.31, and on May 31, 2019, those accounts had negative balances.

On August 16, 2019, Norse defaulted on the Majek Loan and, on September 16, 2019, Majek filed suit in the Law Division against Norse, Hillside, and the guarantors, captioned Majek Investments LLC v. Hillside Norse LLC, Docket No. L-6525-19 (the "Bergen County Action"). On March 31, 2020, Majek obtained final judgment by default against Levine, Hillside, and Norse in the amount of $1,105,195.60.

On or about March 18, 2021, Levine pleaded guilty to conspiracy to commit bank fraud in the matter United States v. Seth Levine, 2:21-CR-00234-SDW-1. Majek contended, based on the Information filed in that case by the

A-3247-20

United States Attorney, that Levine admitted Norse was insolvent when it made the alleged fraudulent payments to Nexus and Privcap.

The government alleged in the Information that Levine "did knowingly and intentionally conspire and agree with others, the co-conspirators, to execute and attempt to execute a scheme and artifice to defraud financial institutions." It alleged Levine was the owner and managing member of Norse and Norse "was the parent company of more than [seventy] other limited liability companies (the 'Subsidiary Companies'), of which L[evine] was also the founding partner, owner, and managing member." The government continued, "through Norse Holdings, and the Subsidiary Companies, L[evine] controlled at least [seventy] multifamily properties, comprising [of] approximately 2,500 apartments (the 'Multifamily Properties')."

The government also alleged it "was the goal of the conspiracy for L[evine] and [his] co-conspirators to enrich themselves by inducing financial institutions to issue mortgage loans based on false pretenses, representations, and promises." It contended that "[f]rom at least in or about 2009 and through in or about August 2019, L[evine] directed a scheme to refinance the Multifamily Properties held in the names of the Subsidiary Companies using fraudulent information about the true value of, and the income generated by, the

5

Multifamily Properties." The government also asserted that "[a]s a result of each fraudulent refinance, the Subsidiary Company that owned the multifamily property received a cash payout, which L[evine] and his co-conspirators used for their own enrichment, to repay investors, and continue the conspiracy."

Majek contended Privcap had actual or constructive knowledge that Levine and his entities were insolvent at the time of the alleged fraudulent transfers to Privcap because Levine was in default on or was late in paying certain loans extended by Privcap. In support of this claim, Majek asserted that on March 12, 2019, Privcap and Levine entered into a loan agreement in the total amount of $490,000 payable no later than March 20, 2019 (the "March 12, 2019 Loan"). On March 13, 2019, Privcap wired $484,950 to Levine's personal TD Bank account. On March 25, 2019, $325,000 of this amount was applied to fund a loan by Privcap to another entity affiliated with Levine, Perth LP Ventures, LLC (the "Perth LP Loan"). The same day, Norse wired the remaining $177,345 to Privcap in satisfaction of the March 12, 2019 Loan. Majek contended Levine was already in default by March 25, 2019, because the March 12, 2019 Loan was payable no later than March 20, 2019.

Majek also argued that, at the time Privcap entered into these loan agreements with Levine and his affiliated entities, two other entities affiliated

6

with Levine, Red Clay Norse, LLC ("Red Clay"), and Riverside Norse, LLC ("Riverside Norse"), were in default on loans made by Privcap to those entities in 2018. Majek alleged that on March 19, and April 19, 2019, Norse wired Privcap payments of $14,000 in connection with these loans.

Majek next argued that on March 28, 2019, Privcap entered into a loan agreement with Levine individually in the amount of $720,000 (the "March 28, 2019 Loan"). The same day, Privcap wired $700,000 to Norse in two payments of $499,000 and $201,000. The March 28, 2019 Loan was payable on April 2, 2019. On April 19, 2019, Norse wired $20,000 to Privcap representing a fee for the March 28, 2019 Loan. On May 22, 2019, Norse made two wire transfers to Privcap in the amounts of $450,000 and $250,000 to repay the March 28, 2019 Loan. Again, Majek contended Levine was in default because the loan was payable on April 2, 2019, but was not paid on time.

Majek contended Nexus had constructive knowledge of Levine's insolvency based on similar arguments. On January 25, 2018, Nexus loaned Levine $850,000 (the "January 25, 2018 Loan"). On February 6, 2018, Nexus loaned Levine $1,075,000 (the "February 6, 2018 Loan"). On February 22, 2018, Nexus loaned Levine $520,000 (the "February 22, 2018 Loan"). Majek

A-3247-20

contended these loans were repaid late and Levine was in default when they were paid.

Majek also argued that on or around August 7, 2018, Nexus facilitated a loan by Powercap Partners, LLP ("Powercap") to Levine in the amount of $1,200,000 (the "Powercap Loan"). It argued Nexus arranged for this loan to Levine while Levine was in default on its own January 25, February 6, and February 22, 2018 loans. After the Powercap Loan funds were disbursed, Levine paid Nexus $1,075,000 in satisfaction of Nexus's February 6, 2018 Loan. On August 13, 2018, Levine paid the remaining $433,500 due under Nexus's January 25, 2018 Loan.

The Powercap Loan was initially payable by December 7, 2018, but was subsequently extended. On January 7, 2019, Powercap's interest in the loan was bought out by new investors. On April 7, 2019, a new investor, SN Funding, bought out the Powercap Loan, and Nexus continued to service the loan. On May 8, and 15, 2019, Norse made wire transfers to Nexus in the amount of $700,000 and $428,000, which Nexus forwarded to SN Funding to pay off the Powercap Loan in full. According to Majek, the Powercap Loan demonstrates Nexus knew Levine was insolvent and engaged in a "Ponzi scheme."

8

Finally, Majek alleged Nexus loaned $375,000 to Levine in April 2018. The loan was initially due on October 17, 2018, but was repaid late by Norse on April 17, 2019.

B.

Privcap asserted the following facts in response to Majek's allegations. According to Daniel Cohen, the managing member of Privcap, Privcap made eighteen to twenty loans to numerous entities controlled by Levine beginning in 2016.

On November 13, 2018, an entity affiliated with Levine, Red Clay, entered into a commercial loan agreement with Privcap (the "Red Clay Loan"). The Red Clay Loan had an original maturity date of February 11, 2019. Red Clay and Privcap agreed to extend the loan due date provided Red Clay made monthly payments until the loan was repaid.

On November 14, 2018, Riverside Norse, another entity affiliated with Levine, entered into a commercial loan agreement with Privcap (the "Riverside Norse Loan"). The Riverside Norse Loan had an original maturity date of May 14, 2019. As with the Red Clay Loan, Riverside Norse and Privcap agreed to extend the loan due date provided Riverside Norse made monthly payments.

A-3247-20

On March 19, 2019, Norse wired $14,000 to satisfy the extension payments owed by Red Clay and Riverside Norse under their respective loans. On April 19, 2019, Norse again wired $14,000 to satisfy the extension payments owed by Red Clay and Riverside Norse in connection with those loans. As a result, Privcap did not consider Red Clay or Riverside Norse to be in default as alleged by Majek.

On March 12, 2019, Levine and Privcap entered into a short-term loan in the amount of $490,000 with an initial maturity date of March 20, 2019. On March 13, 2019, Privcap wired $484,950 to Levine's personal bank account. On March 25, 2019, $325,000 of that loan was used to fund the Perth LP Loan. The remaining $177,345, which represented the balance of the principal plus interest, was returned to Privcap on March 25, 2019. The Perth LP Loan remains unpaid.

On March 28, 2019, Privcap made another personal loan to Levine in the amount of $720,000. The March 28 Loan was due on April 2, 2019. On March 28, 2019, at Levine's direction, Privcap wired $700,000 to Norse in two separate transfers of $201,000 and $499,000. After transferring the funds to Norse, Levine no longer required the March 28, 2019 Loan because a certain deal was not completed and the funds were returned to Privcap. On April 19, 2019, Norse paid a $20,000 fee for the March 28, 2019 Loan. On May 22, 2019, Norse paid

10

the remaining $700,000 due under the March 28 Loan in two payments of $450,000 and $250,000.

## C.

Nexus added the following facts in response to Majek's claims. On January 25, 2018, Nexus loaned Levine $850,000. The January 25, 2018 Loan was "due and payable on the earlier of April 25, 2018 . . . or the sale or refinance" of certain properties. Nexus agreed to extend the loan maturity date to August 13, 2018, subject to Levine making extension payments. Nexus did not consider the borrower in default because Nexus received the required extension payments. On or about August 13, 2018, the January 25, 2018 Loan was paid off in full.

Nexus made two other loans to Levine on February 6, and 22, 2018. Under the term of the February 6, 2018 Loan, Levine was required to repay $1,075,000 to Nexus no later than May 6, 2018. Again, the loan documents gave Levine the contractual right to extend the maturity date. Although the loan technically matured on July 6, 2018, Nexus agreed to extend the maturity date to August 6, 2018, in exchange for payment of an extension fee. The February 6, 2018 Loan was never deemed to be in default by Nexus and it was timely paid in full on August 6, 2018, in connection with the Powercap Loan.

11

Under the terms of February 22, 2018 Loan, Levine was required to repay $520,000 to Nexus no later than May 22, 2018. Again, Levine had the contractual right to extend that maturity date. According to Nexus, on or about July 22, 2018, the parties agreed to refinance the loan, and, thereafter, entered into several extension agreements. As a result, the new maturity date was January 22, 2019. On or about January 17, 2019, the loan was repaid in full. Nexus did not consider the February 22, 2018 Loan to have ever been in default.

On August 7, 2018, Nexus participated in and serviced the Powercap Loan. Powercap disbursed a total of $1,122,500 after deducting fees and expenses. Of the $1,122,500 disbursed under Powercap Loan, $47,500 was wired to the Levine's personal bank account, and the remaining $1,075,000 was transferred to Nexus to pay off the February 6, 2018 Loan. The Powercap Loan was essentially a refinance of the February 6, 2018 Loan.

Although the original maturity date of the Powercap Loan was October 7, 2018, Levine exercised his contractual right to extend the loan through December 7, 2018, and, thereafter, Nexus agreed to extend the loan for another month through January 7, 2019. Levine paid and Nexus received fees for each extension, which Nexus distributed to the investors.

 A-3247-20

On January 7, 2019, Powercap's interest in the loan was bought out by new investors and the loan was refinanced. Powercap was paid off after collecting interest, Nexus received its fees for refinancing and extending the loan, and the new investors found a new business opportunity.

On April 7, 2019, a new investor, SN Funding, bought out Nexus's investors and bought the Powercap Loan. Nexus continued to service the Powercap Loan. On May 8, and 15, 2019, Nexus received wire transfers for $700,000 and $428,000 from Norse to pay off the Powercap Loan, which Nexus forwarded to SN Funding.

On April 17, 2018, Nexus loaned $375,000 to Levine (the "April 17, 2018 Loan"). The original maturity date was October 17, 2018. Levine had the right to extend the maturity date until April 17, 2019, which he did. Levine repaid the April 17, 2018 Loan on April 17, 2019.

Nexus also contended Norse continued to conduct business after the last alleged fraudulent transfer to Nexus on May 15, 2019. This included payments by Norse to Majek. The Majek Loan was initially payable on April 17, 2019. Norse paid three monthly extension fees of $7,500 per month to Majek and extended the maturity date to July 17, 2019. On July 30, 2019, Norse paid Majek

A-3247-20

an additional $37,500 forbearance fee to extend the payment date of the Majek Loan to August 2, 2019.

Nexus argued that Majek's own allegations demonstrate Norse continued to conduct business after May 15, 2019. For example, Majek alleged Norse paid $700,000 to Privcap on May 22, 2019. Majek also contended Norse received funds as a result of a loan by Coventus, LLC, from June 4, 2019 through July 3, 2019 (the "Coventus Loan").[2]

## III.

On May 19, 2021, the trial court issued a written opinion granting summary judgment to Nexus and Privcap and denying summary judgment to Majek. The court explained:

> The court finds no evidence of the badges of fraud being demonstrated.
>
> . . . .
>
> Further, the court finds that the transfers from Norse to Nexus and Privcap did not render Norse insolvent. As Nexus points out, Norse engaged in other lending/receiving business after it . . . [paid] off its debts to Nexus and Privcap. While Norse did not have money in its account after paying off Nexus and Privcap, Norse subsequently had money in its account not too long after and used it to engage in other business schemes.

---

[2] While this appeal was pending, Majek reached a settlement with Coventus.

A-3247-20

The court noted "Majek ha[d] already obtained a judgment in [the] Bergen County [Action] against Seth and Shira Levine, Norse, and Hillside, [and] the present action . . . appears to be a way in which to satisfy same."

On June 25, 2021, the trial court issued a written opinion denying Majek's motion for reconsideration. The court reaffirmed its finding that Majek failed to demonstrate any of the "badges of fraud" and failed to establish Norse was insolvent. Additionally, the court observed:

> Majek has been unable to collect on its judgment against Levine and Norse from the Bergen County [A]ction, and is going down the line trying to collect from entities that did business with Levine (as did Majek) but are not owned or controlled by Levine. While the [c]ourt is sympathetic to those who obtain judgments and are unable to collect them, the [c]ourt cannot enforce said judgment as to parties for which the judgment was not obtained.

This appeal followed. Majek argues the trial court erred in determining Norse was not insolvent, failed to consider whether the transfers were made for reasonably equivalent value, erred in applying the "badges of fraud" analysis to its actual fraud claim, and failed to consider whether the alleged fraudulent payments were made to "insiders."

IV.

15

We review the trial court's denial of a summary judgment motion de novo. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021). No special deference is accorded to a trial judge's assessment, as the decision to grant or withhold summary judgment amounts to a ruling on a question of law. See Manalapan Realty, LP v. Manalapan Twp. Comm., 140 N.J. 366, 378 (1995). We must "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Statewide Ins. Fund v. Star Ins. Co., 253 N.J. 119, 125 (2023) (internal quotation marks omitted) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995)).

We affirm substantially for the reasons set forth in the court's May 19, and June 25, 2021 written opinions. We add the following comments.

The purpose of the Uniform Fraudulent Transfer Act ("UFTA")[3] "is to prevent a debtor from placing his or her property beyond a creditor's reach" and from "deliberately cheat[ing] a creditor by removing his property from 'the jaws of execution.'" Gilchinsky v. Nat'l Westminster Bank, 159 N.J. 463, 475 (1999)

---

[3] The UFTA was amended effective August 10, 2021. We will apply the law in effect at the time of the decisions below.

A-3247-20

(quoting <u>Klein v. Rossi</u>, 251 F.Supp. 1,2 (E.D.N.Y. 1966)). The UFTA allows a creditor to undo a wrongful transaction so as to bring the property within the ambit of collection. <u>Id.</u> at 475. If a fraudulent transfer is proven, a creditor may obtain "[a]voidance of the transfer or obligation to the extent necessary to satisfy the creditor's claim." N.J.S.A. 25:2-29(a)(1). Where the transfer cannot be undone, a creditor may obtain a judgment for the value of the asset fraudulently transferred against "[t]he first transferee of the asset or the person for whose benefit the transfer was made." N.J.S.A. 25:2-30(b)(1)(A).

The UFTA contains two subsections that provide relief to plaintiffs for fraudulent transfers. N.J.S.A. 25:2-25 governs fraudulent transfers as to present and future creditors. It provides:

> a. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
>
> (1) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
> (a) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were

unreasonably small in relation to the business or transaction; or

(b) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

[N.J.S.A. 25:2-25(a).]

N.J.S.A. 25:2-27 governs fraudulent transfers as to present creditors. It states:

a. A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

b. A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

A court applying the UFTA must undertake a fact-sensitive inquiry, analyzing the circumstances and the terms of the transfer at issue. Motorworld, Inc. v. Benkendorf, 228 N.J. 311, 326 (2017). The plaintiff bears the burden of

establishing a claim under the UFTA by clear and convincing evidence.[4]  Jecker v. Hidden Valley, Inc., 422 N.J. Super. 155, 164 (App. Div. 2011); Barsotti v. Merced, 346 N.J. Super. 504, 520 (App. Div. 2002).

Majek contends the trial court erred by granting summary judgment on its claims under N.J.S.A. 25:2-25(b) and N.J.S.A. 25:2-27(a) because Norse was insolvent, and it did not receive reasonably equivalent value for the payments to Nexus and Privcap.  We are not persuaded.

Under the UFTA, "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation."  N.J.S.A. 25:2-23(a).  Further, "[a] debtor who is generally not paying his debts as they become due is presumed to be insolvent."  N.J.S.A. 25:2-23(b).

The trial court determined correctly that Majek failed to produce competent proof that Norse was insolvent at the relevant time.  In support of this claim, Majek relies almost exclusively on the Information filed by the government against Levine.  The Information, however, is a charging document that set forth the government's allegations.  The Information is not evidence of

---

[4]  The 2021 amendment changed the burden of proof to a preponderance of the evidence effective August 10, 2021.  N.J.S.A. 25:2-25; N.J.S.A. 25:2-37.  Again, we will apply the burden of proof applicable at the time of the decisions below.  Majek's claims, however, fail under either standard.

any statements allegedly made by Levine.  The fact that Levine pleaded guilty to the charges does not prove he admitted all of the allegations included in the Information.

Even if Majek proved Levine made such admissions, Levine's alleged statements are not admissible against Nexus and Privcap.  Majek improperly conflates the concepts of judicial notice pursuant to N.J.R.E. 201(b) and self-authentication under N.J.R.E. 902 with the admissibility of Levine's alleged hearsay statements against Nexus and Privcap under N.J.R.E. 802.   Under N.J.R.E. 801, hearsay means an out-of-court statement offered to prove the truth of the matter asserted.  Hearsay is not admissible absent an applicable exception. N.J.R.E. 802.  Levine's alleged statements are plainly hearsay.  Majek does not identify any applicable hearsay exception.  Levine's alleged statements are not admissible against Nexus and Privcap to prove the truth of the matters asserted.

The allegations set forth in the Information are insufficient to prove Norse was insolvent at the relevant time.  They refer generally to Levine and the more than seventy Subsidiary Companies that owned at the Multifamily Properties over a period of ten years beginning in 2009.  Majek's contention that the government's allegations prove Norse was insolvent when the alleged fraudulent transfers were made in 2019 is without merit.

The trial court also concluded correctly that Majek failed to offer any competent evidence to establish Norse was in default of its obligations to Nexus and Privcap or was not paying its debts as they became due. Majek's claims that Norse was in default in connection with loans made by Nexus and Privcap are based on nothing more than Majek's unsupported supposition and conjecture. In response to Majek's allegations, Nexus and Privcap established Norse was not in default on any of their loans. In fact, at least two of the allegedly fraudulent transfers to Privcap were for extension fees paid in connection with the Red Clay Loan and the Riverside Norse Loan so those loans would not be in default.

In addition, as the trial court correctly noted, Norse continued to do business after the last allegedly fraudulent transfer to Privcap on May 22, 2019. This included receiving proceeds from the Coventus Loan in June and July 2019, and making substantial payments to Majek in connection with the Majek Loan through July 30, 2019.

Majek also failed to offer any competent evidence to establish Norse's debts were greater than its assets at fair valuation. Majek did not proffer any evidence of Norse's total debts or the fair value of its assets. The trial court concluded correctly that Majek failed to produce evidence sufficient for a

21

reasonable fact finder to conclude either, by clear and convincing evidence or by a preponderance of the evidence, that Norse was insolvent.

We are also unpersuaded by Majek's claim that Norse did not receive reasonably equivalent value for the subject payments to Nexus and Privcap. Generally, "a 'transfer made in satisfaction of the debt of another is not made for reasonably equivalent value.'" Motorworld, 228 N.J. at 328 (quoting Nat'l Westminster Bank N.J. v. Anders Eng'g, Inc., 289 N.J. Super. 602, 606 (App. Div. 1996)).

> However, exceptions to the general rule can be found where the debtor receives the benefit of the original consideration, . . . or where the debtor and third party "are so related or situated that they share an identity of interests because what benefits one will, in such case benefit the other to some degree."
>
> [In re R.M.L., 195 B.R. 602, 618 (Bankr. M.D. Pa. 1996) (internal citation omitted) (quoting In re Pembroke Dev. Corp., 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991)).]

"When we apply a uniform act, we may consider the law of other jurisdictions that have enacted similar provisions." Motorworld, 228 N.J. at 325 n.4. In determining whether reasonably equivalent value has been given to the debtor in exchange for a transfer, courts consider whether the debtor received any "indirect benefit" from other parties. See Mellon Bank, N.A. v. Metro

22

Comms., Inc., 945 F.2d 635, 646 (3d Cir. 1991) ("[I]n evaluating whether reasonably equivalent value has been given the debtor under section 548 [of the bankruptcy code], indirect benefits may also be evaluated. If the consideration [debtor] received from the transaction, even though indirect, approximates the value it gave [to the transferee], this can satisfy the terms of the statute."); Rubin v. Mfrs. Hanover Tr. Co., 661 F.2d 979, 991 (2d Cir. 1981) (although transfers solely for the benefit of third parties do not furnish fair consideration, the transaction's benefit to the debtor need not be direct and may come through a third party); Image Masters, Inc. v. Chase Home Fin., 489 B.R. 375, 387 (E.D. Pa. 2013) (courts may consider both direct and indirect benefits conferred by the transfer in its evaluation of reasonable equivalent value).

As Majek alleges, the subject transfers were made by Norse to satisfy obligations of Levine, who was the owner and managing member of Norse, and other entities affiliated with Levine and Norse. The transfers to Nexus paid off loans extended by Nexus to Levine. The transfers to Privcap were made in connection with the Red Clay Loan, the Riverside Norse Loan, the March 12, 2019 Loan, and the March 28, 2019 Loan.

As Majek contends, Levine, Norse and the other Levine entities comingled funds, shared obligations, and were essentially indistinct from each other. The

Majek Loan, for example was secured by a promissory note executed by Norse, but the funds were deposited, at Levine's direction, into an account owned by Levine's affiliated entity, Hillside. Moreover, the Majek Loan was secured by a personal guaranty executed by Levine and a pledge of his interest in Hillside. Under the specific facts of this case as alleged by Majek, by satisfying debts and obligations of Levine and entities affiliated with Levine and Norse, Norse indirectly received reasonably equivalent value for the transfers.

Majek's claim that the transfers to Nexus and Privcap were made to statutory "insiders" in violation of N.J.S.A. 25:2-27(b) is baseless. N.J.S.A. 25:2-22(b) defines an insider to include:

> (1) [a] director of the debtor; (2) [a]n officer of the debtor; (3) [a] person in control of the debtor; (4) [a] partnership in which the debtor is a general partner; (5) [a] general partner in a partnership [in which the debtor is a general partner]; or (6) [a] relative of a general partner, director, officer, or person in control of the debtor[.]

"The unifying theme among the enumerated persons is that they stand in such close relation to the debtor as to give rise to the inference that they have the ability to influence or control the debtor's actions." Gilchinsky, 159 N.J. at 478. Majek does not offer any evidence to support a finding that Nexus and Privcap were "insiders" of Norse or any other entity affiliated with Levine.

Nexus and Privcap, like Majek, were creditors as a result of loans extended to Levine and his affiliated entities. They were not insiders.

The trial court also concluded correctly that Majek did not establish any of the "badges of fraud" and properly granted summary judgment on its "actual fraud" claim under N.J.S.A. 25:2-25(a). Under N.J.S.A. 25:2-25(a), a transfer from a debtor is fraudulent when it is made "[w]ith actual intent to hinder, delay, or defraud any creditor of the debtor." N.J.S.A. 25:2-26 lists the "badges of fraud" that courts should consider in determining whether a debtor conveyed property with the actual intent to place it beyond the reach of creditors. Gilchinsky, 159 N.J. at 476. It provides:

> In determining actual intent under subsection (a) of [N.J.S.A.] 25:2-25 consideration may be given, among other factors, to whether:
>
> a. The transfer or obligation was to an insider;
>
> b. The debtor retained possession or control of the property transferred after the transfer;
>
> c. The transfer or obligation was disclosed or concealed;
>
> d. Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> e. The transfer was of substantially all the debtor's assets;

f. The debtor absconded;

g. The debtor removed or concealed assets;

h. The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

i. The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

j. The transfer occurred shortly before or shortly after a substantial debt was incurred; and

k. The debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

[N.J.S.A. 25:2-26.]

As to the badges of fraud, the Gilchinsky Court instructed:

In determining actual intent to defraud, courts should balance the factors enumerated in N.J.S.A. 25:2-26, as well as any other factors relevant to the transaction . . . . The proper inquiry is whether the badges of fraud are present, not whether some factors are absent. Although the presence of a single factor, i.e. badge of fraud, may cast suspicion on the transferor's intent, the confluence of several in one transaction generally provides conclusive evidence of an actual intent to defraud.

[Gilchinsky, 159 N.J. at 477.]

26

We have already considered and rejected Majek's claims that Norse was insolvent, Nexus and Privcap were insiders of Norse, and Norse did not receive reasonably equivalent value for the transfers. Those "badges of fraud" do not apply.

Majek's claim that Levine "absconded" because he was arrested is entirely without merit. Levine did not abscond. Being arrested is not the equivalent of absconding. Majek's claim that Nexus and Privcap were engaged in or aided Levine's "Ponzi scheme" is also baseless. Nexus and Privcap, like Majek, were creditors of Levine and his affiliated entities. There is no evidence they participated in any type of fraudulent conduct and there is absolutely no evidence they participated in or aided a "Ponzi scheme."

Majek failed to offer evidence sufficient for a reasonable fact finder to determine either, by clear and convincing evidence or by a preponderance of the evidence, that the payments to Nexus and Privcap were made with actual intent to hinder, delay, or defraud Majek.

To the extent we have not addressed any remaining arguments, it is because they lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

27

A-3247-20